## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MAINE

**BOBBI NICHOLS**

     Plaintiff,

**v.**

**THE UNITED STATES OF AMERICA**

    Defendant.

Docket No. _____

## PLAINTIFF'S COMPLAINT

This case arises out of negligence by the United States of America and its agencies which resulted in the mass shooting in Lewiston, Maine on October 25, 2023. Plaintiff, Bobbi Nichols, as a direct injury victim, eyewitness to the mass shooting, and bystander eyewitness to her sister's (Tricia Asselin) shooting and death, brings this Complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674 against the United States of America.

## TABLE OF CONTENTS

**Introduction** …………………………………………………………………………... **5**

**Parties** ……………………………………………………………………………….. **14**

**Army Command Chart** ……………………………………………………………….. **15**

**Army's Knowledge of Mental Health Risks** ……………………………………………. **16**

**The Army Ignores Card's Mental Health Crisis** ……………………………………….. **20**

   A.  Card's Army Career …………………………………………………………….. 20

   B.  July–December 2022: Army knows Card's mental collapse begins ……………………. 21

   C.  March-May 2023: Army Learns Card's mental decline worsens ………………………. 22

   D.  June 2023: Army knows Card is now in crisis …………………………………………. 24

   E.  Early July 2023: Army knows Card is now violent ……………………………………….. 24

   F.  July 16, 2023: Card tells Army, "I am capable" and Army orders Card into involuntary commitment at mental health hospital ……………………………………………….. 26

   G.  July 16–July 25, 2023: Army learns Card has a "hit list." ……………………………… 29

   H.  July 25–August 3, 2023: Army command promises to take away Card's weapons but doesn't ……………………………………………………………………………….. 31

   I.  August 2023: Mental hospital discharge, failed firearm purchase, and failure to follow up ……………………………………………………………………………………... 33

   J.  September 2023: Army learns Card threatens mass shooting ………………………….. 34

   K.  The Army protects itself, but not the public …………………………………………… 37

   L.  October 2023: Card misses mandatory training and Army does nothing ……………….. 43

   M.  October 25, 2023: The Lewiston Mass Shooting …………………………………….. 44

**The Army's Failures** …………………………………………………………………... **46**

A.  The Army delayed initiating a Command-Directed Evaluation .............................. 46

    i.  The Army new early on Card was having a mental health crisis ................... 46

    ii.  The Army promised Sagadahoc Sherrif's and the Card family they would intervene
.................................................................................................... 47

B.  Once committed, Card's hospitalization required follow through .......................... 49

    i.  Risks of Service-Related Exposure to Blast Explosions ............................. 49

    ii.  Command-Directed Commitment .................................................... 50

    iii.  Line of Duty Investigation and Medical Evaluation Board Review .............. 51

    iv.  Failure to Secure Firearms ........................................................... 53

C.  The Army failed to act on specific threats of mass shootings .............................. 54

D.  Inspector General Review of the Army's Conduct finds the Army failed to follow
regulations and caused the mass shooting on October 25, 2023 ........................... 57

**Causes of Action ......................................................................................... 60**

A.  Negligent Undertaking in the Investigation and Management of Robert Card's Mental
Health Crisis .................................................................................... 60

B.  Negligence in Responding to Danger Within the Foreseeable Zone of Risk ............... 64

C.  Negligence of the United States in Violating Its Own Commitments, Orders, and
Conditions of Card's Release Back into the Community ................................... 67

D.  Negligent Care, Treatment, Discharge, Follow Up and Failure to Warn ................... 70

E.  Negligence and Negligent Undertaking of United States in Failing to Follow Process for
Line of Duty Investigation and Medical Board Adjudication of Rober Card's Illness .... 74

F.  Negligence and Negligent Undertaking in Failure to Report Card to the FBI Background
Search Database Based on His Commitment to a Mental Institution ....................... 80

G.  Negligence in Failure to File SAFE Act Report ……………………………………… 84

H.  Negligent Training …………………………………………………………………… 87

I.  Negligent Supervision ……………………………………………………………….. 89

J.  Negligent Infliction of Emotional Distress (Bystander Liability) ……………………… 91

K.  Negligent Infliction of Emotional Distress (Zone of Danger Liability) ………………… 92

**Damages ………………………………………………………………………………….. 93**

A.  Plaintiff's Physical Injuries ……………………………………………………….. 93

B.  Plaintiff's Bystander Claim: Present with a Family Member and Suffered Severe Emotional Distress and/or Physical Injuries Caused by Her Severe Emotional Distress ………….. 94

C.  Plaintiff's Zone of Danger Claim ………………………………………………. 94

**Jurisdiction & Venue ……………………………………………………………….. 95**

**Service ……………………………………………………………………………….. 96**

**Conclusion ………………………………………………………………………….. 96**

**INTRODUCTION**

1.1.    This case arises from one of the most preventable mass tragedies in American history– a mass shooting that could and should have been stopped by the United States Army months before Robert Card terrorized Maine on October 25, 2023.

1.2.    For decades, the United States Army has recognized that military service carries profound mental health risks for those in uniform and for the communities to which they return. This reality drove the military to establish rules to protect Soldiers and safeguard their communities. The urgency of those measures was underscored by the emergence of a grim pattern: mass shootings committed all over the United States by the current and former military personnel, many of whom experienced mental health breakdowns.

1.3.    **Killeen, Texas (1991)**. On October 16, 1991, George Hennard, a U.S. Navy veteran, drove his pickup truck through the entrance of a Luby's Cafeteria in Killeen, Texas. He then opened fire, killing 23 people and injuring 27 others before killing himself. At the time, it was the worst mass shooting in U.S. history.

1.4.    **Oklahoma City Bombing (1995)**. On April 19, 1995, Timothy J. McVeigh, a Gulf War veteran and former U.S. Army Sergeant, detonated a truck bomb at the Murrah Federal Building in Oklahoma City, killing 168 people (including 19 children) and injuring hundreds. McVeigh's case is often cited in analyses of how military training, coupled with ideological extremism and mental distress, can result in catastrophic outcomes.

1.5.    **D.C. Sniper (2002)**. In October 2002, John Allen Muhammad, a Gulf War Army veteran, and an accomplice terrorized the Washington D.C. area in a sniper shooting spree that killed 10 people and injured three. Muhammad, who had served in the Army during the 1980's and early '90s, carried out the attacks ostensibly to cover up a planned murder of his ex-wife and to wreak

Page 5 of 97

general havoc. He had a history of domestic violence and had shown signs of psychological deterioration after his military service.

1.6.    **Fort Hood (2009)**. On November 5, 2009, U.S. Army Major Nidal M. Hasan, an army psychiatrist, opened fire at Fort Hood, killing 13 people and wounding over 30 others. Hasan was an active-duty Soldier at the time. Hasan's deteriorating mental health and extremist views had been reported to his superiors, and the Army failed to intervene before the shooting.

1.7.    **Wisconsin Sikh Temple Shooting (2012)**. On August 5, 2012, Wade Michael Page, a 40-year-old Army veteran, entered the gurdwara (Sikh) temple in Oak Creek, Wisconsin and murdered 7 people, injuring four others. Page then committed suicide. He was discharged from the Army for patterns of misconduct.

1.8.    **Washington Navy Yard Shooting (2013)**. On September 16, 2013, Aaron Alexis, a 34-year-old former Navy reserve member, entered the Washington Navy Yard and gunned down 12 people, injuring several others. Alexis had served as an aviation electrician's mate in the Navy Reserve (2007-2011) before being discharged for misconduct. Post-mortem analyses revealed Alexis had mental health issues including paranoia and delusions of hearing voices, but he had not received adequate treatment or security flagging before the attack.

1.9.    **Fort Hood, Texas (2014)**. On April 2, 2014, Army Specialist Ivan A. Lopez shot and killed three people wounded and twelve others before killing himself at the Army base in Fort Hood, Texas. An investigation into the shooting found that Lopez was undergoing regular psychiatric treatment for depression, anxiety, and post-traumatic stress disorder. Prior to the shooting, Lopez also made allegations of being taunted and picked on by other Soldiers in his unit.

1.10.    **For Hood/Killeen, Texas (2015)**. On February 22, 2015, active-duty U.S. Army Specialist Atase Giffa shot and killed 4 people and injured several others before turning the gun on himself.

The victims included his wife and neighbors who sheltered the wife from SPC Giffa. Weeks before the shooting, his wife reported him to the Army for domestic violence and Giffa was ordered confined to his barracks. But the Army released him from confinement, and Giffa committed the mass shooting soon after his release.

1.11.    **Dallas and Baton Rouge Police Ambushes (2016)**. In July 2016, two separate targeted attacks on police were carried out by military veterans. Micah Xavier Johnson, an Army Reserve veteran who had served in Afghanistan, ambushed police in Dallas, killing five officers and injuring others during a protest. Just days later, Gavin E. Long, a former Marine, shot and killed three officers in Baton Rouge. The shooters had exhibited signs of distress and isolation post-service (Johnson was reportedly upset over an other-than honorable discharge; Long had mental health evaluations for PTSD).

1.12.    **Sutherland Springs, Texas (2017)**. On November 5, 2017, Devin Patrick Kelley, an Air Force veteran, opened fire in a church in Sutherland Springs, Texas, killing 26 people and wounding 22 others. Kelley received a bad-conduct discharge from the Air Force in 2014 after a court-martial for domestic violence. Notably, the Air Force failed to report his prior felony conviction to the FBI database, which allowed Kelley to pass background checks and purchase firearms. A Texas federal court held that the Air Force's negligence caused the shooting, and the shooting was foreseeable given the military and domestic violence history of the shooter.

1.13.    **Thousand Oaks Bar Shooting (2018)**. In November 2018, Ian David Long, a Marine Corps veteran, stormed a crowded bar in Thousand Oaks, California, and fatally shot 12 people during a college night event. Long was a machine gunner who had served in Afghanistan. Friends and authorities noted he exhibited erratic behavior after his service, and there were suspicions he suffered from PTSD.

1.14.   In response to the patterns of violence, the Army developed comprehensive protocols, regulations, and systems designed to identify at-risk Soldiers and intervene before they could harm themselves or others. These protocols were not suggestions–they were mandatory requirements backed by federal law and military regulations, designed to protect both Soldiers and civilians.

1.15.   The Army knew that reserve Soldiers and National Guard members with mental health crises presented unique risks to themselves and the public. Unlike active-duty Soldiers who have daily command oversight and support, reserve Soldiers return to civilian communities after training, often carrying weapons and experiencing social isolation. The Army recognized this risk and created specific intervention mechanisms to address it.

1.16.   The Army also knew from extensive research that Soldiers exposed to repeated blast explosions–such as those who serve as grenade range instructors–suffer traumatic brain injuries that can manifest as paranoia, aggression, and violent ideation. This knowledge was not theoretical; it was based on years of Army-funded studies documenting the devastating neurological effects of blast exposure on service members.

1.17.   The Department of Veterans Affairs has confirmed that "[e]xposure to blast is an independent factor influencing psychiatric symptoms in Veterans beyond PTSD and mild TBI."[1]

1.18.   Pentagon leaders are finally admitting publicly what the Army has known for many years: "Blast overexposure is one of many factors that can negatively affect warfighter brain health."[2]

1.19.   The Army knew that the combination of mental health deterioration, blast-induced brain injury, access to weapons, and paranoid delusions required immediate and decisive intervention to

---

[1]  Statement of said Dr. Sarah Martindale of the W.G. (Bill) Hefner VA Medical Center, available at https://www.research.va.gov/currents/0222-Teasing-out-the-effects-of-blasts-on-mental-health.cfm.

[2] Statement of Deputy Defense Secretary Kathleen Hicks, available at https://www.army.mil/article/279051/dod_blast_summit_brings_together_public_health_safety_experts_to_address_blast_overpressure_concerns.

prevent tragedy. The Army had mandatory reporting systems, crisis intervention protocols, and state law utilization procedures designed for such situations.

1.20.   Well before the mass shooting, the Army was aware that Robert Card had classic warning signs of high risk to himself and the public. The Army's knowledge; its mandatory processes; its promises to Card's family, medical providers and local law enforcement; and its actions in undertaking to intervene individually and in combination created a legal duty on the part of the Army to address the risks posed by Card in a reasonable manner.

1.21.   Card was a 20-year Army reserve Soldier who had been exposed to tens of thousands of blast explosions during his service as a firearms and grenade instructor at West Point.

1.22.   In 2022 and 2023, Card's mental health deteriorated rapidly and without any identified cause. By March 2023, the United States and its personnel knew Card was paranoid, delusional, violent, and lacked impulse control. The Army knew he had access to firearms. The Army promised to remove his guns but did not fulfill that promise. Worse, through its acts and omissions, the Army withheld information and actively misled local law enforcement, thereby preventing others from intervening and separating Card from his weapons.

1.23.   The warning signs escalated. By July 2023, during Army Reserve training at West Point, Card accused fellow soldiers of calling him a pedophile, threatened violence, physically assaulted a fellow Soldier, and told police officers he was "capable" of violence. His commanding officer ordered an immediate psychiatric evaluation, and Card was involuntarily hospitalized for over two weeks at Four Winds psychiatric hospital in New York.

1.24.   The Army knew that while in the hospital, Card admitted to homicidal ideation and to preparing a "hit list" of people he intended to kill. Card stated that his targets were those he

perceived had wronged him, including those he had bowled and played cornhole with at the bowling alley and bar he later attacked on October 25, 2023.

1.25. The Army's own medical providers concluded that Card posed a significant risk of violence and conditioned Card's discharge from the hospital on the removal of his personal weapons from his home. So severe were Card's threats and mental collapse that the Army's psychiatrist, Capt. Dickerson, took less than an hour to determine Card was not "fit for duty." Army medical personnel placed Card on "High Interest" status, determined he did not meet medical retention standards, and recommended restricting his access to military weapons and ammunition. These were mandatory safety protocols designed to prevent exactly what happened on October 25, 2023.

1.26. As Card's threats escalated, the Army continued its failure to follow its own mandatory protocols and orders or to respond reasonably. In September 2023, Card threatened to "shoot up" the Army Reserve center in Saco, Maine, and other locations. Fellow reserve Soldier Sean Hodgson texted Army supervisors stating he believed Card was "going to snap and do a mass shooting." Instead of taking immediate action, Army Captain Jeremy Reamer dismissed these warnings and called Hodgson "not the most credible of our Soldiers." Then, on October 25, 2023, Card did what he told the Army he would do.

1.27. The shooting happened because Army personnel broke their promise to the Card family that they would address his mental health problems.

1.28. The shooting happened because Army personnel did not take specific, mandatory actions after Card was committed to a mental health hospital during military training.

1.29. The shooting happened because Army personnel dismissed and then ignored Card's friend and fellow Soldier's report that Card would "snap and do a mass shooting."

1.30.    It happened because Army personnel convinced local law enforcement, staged outside Card's home ready to remove his weapons, that there was no need and that Card was not a danger.

1.31.    Despite these warnings and repeated opportunities, the Army failed to act.

1.32.    On October 25, 2023, Robert Card carried out his threats. Just before 7:00 PM, Card entered Just-In-Time Recreation bowling alley in Lewiston, Maine, armed with a .308 caliber AR-10 style rifle, and began systematically executing innocent people, including Bobbi Nichols' sister, Tricia Asselin, while Bobbi Nichols watched from a distance of mere feet. Then, Card drove to Schemengees Bar & Grille killing ten more people.

1.33.    In total, Card gunned down 18 people:



1.34.    The bowling alley, Just-In-Time Recreation, and the bar, Schemengees Bar & Grille, were fixtures of Lewiston's community. Just-In-Time, open for decades, hosted youth bowling leagues, adult tournaments, and family gatherings, serving as a "second home" for many in the community. Coaches like Bob Violette and his wife Lucy dedicated 15 years to mentoring children there, fostering a culture where everyone felt like family. Schemengees, under manager Joe Walker, was a hub for Maine's deaf community and cornhole enthusiasts, hosting weekly tournaments that drew diverse crowds. They had always been safe places for fun and connection.

1.35.    On October 25, more than 60 people, including at least 20 children, were at Just-In-Time Recreation. When shooting started, Tricia Asselin attempted to call 911 as others fled. She died trying to complete the call to save others. Thomas Conrad, an Army veteran, rushed the gunman to shield and save children, sustaining fatal wounds. Michael Deslauriers and Jason Walker saved their wives and the young bowlers by attempting to disarm Card and sacrificing their lives. Card killed them both at close range in the presence of Walker's wife, Catherine, and Deslauriers' long-time girlfriend, Stacy Cyr. Tom Giberti shepherded children to safety through a back exit. He was shot five times in the legs during the escape. Amid the chaos, Bill Young shielded his son Aaron, a young bowling prodigy who had recently bowled a personal best of 275. Bill and Aaron were both shot and killed, taking from Cynthia Young her beloved husband and son.

1.36.    Card's second target, Schmengees Bar, had a devoted cornhole following that included deaf and hearing players alike. Manager Joe Walker nurtured the cornhole community, hosting weekly cornhole tournaments that drew players like Bryan MacFarlane, a trailblazing deaf trucker; Joshua Seal, an interpreter who bridged communication gaps for the deaf community in Maine during the COVID-19 pandemic; William ("Billy") Bracket, a devoted father and local high school sports legend; and Stephen Vozzella, a postal worker about to celebrate his first wedding anniversary with his wife, Megan. For them, Schemengees was a second home where everyone understood each other and shared a purpose.

1.37.    On the night of the shooting, the American Deaf Cornhole team was mid-tournament when Card entered. Bryan MacFarlane and Billy Brackett were laughing together moments before Card entered. Joshua Seal died shielding others, his body found near the bar's entrance. Joe Walker charged Card in a final act of protection. Card killed four members of the deaf community that

night. The killing of Seal, Vozzella, MacFarlane, and Brackett is the deadliest mass shooting of deaf people in U.S. history.

1.38.    Their deaths and injuries of many others were avoidable and preventable.

1.39.    From the start, the Army disregarded its mandatory policies and procedures, and regulations when dealing with Card. Despite the serious issues Card presented at the company or battalion level, they were not reported up the chain of command to senior military officials with the knowledge, experience, and resources to address them. Instead, low-ranking, part-time personnel mismanaged the risks, resulting in disastrous consequences.

1.40.    The United States, through its agencies, including the Department of Defense, the Department of the Army, the United States Army Reserve Command, and Keller Army Community Hospital, and its agents and employees, failed to act reasonably, broke the promises they made to Card's family and their community, violated mandatory policies, procedures, and disregarded directives and orders, including those of Card's treating medical providers. The Government's conduct directly and proximately caused the mass shooting on October 25, 2023.

1.41.    Mass shootings, like the one in Lewiston on October 25, 2023, were once rare; however, they have become an epidemic in America.

1.42.    Mental health warning signs in service members are crucial predictors of violence and demand attention. Service members with mental illness are at a higher risk of self-harm or harming others. By 2023, it was well-established that current and former members of the U.S. Armed Forces had higher suicide risks than the civilian population. For example, in 2020, the veteran suicide rate was 57.3% higher than the adjusted rate for non-veteran adults.

1.43.    As detailed above, current and former military personnel have a long history of committing mass violence at a higher rate than the public at large. A CBS News analysis found that about 26%

of mass shooters over the past six decades had military experience, despite only about 7% of U.S. adults being military veterans.

1.44.    The Army, knowing these risks and the specific warning signs presented by its Soldier, Robert Card, made promises to intervene in their Soldier's mental health crisis, but did not take reasonable care in doing so. As a result, Card's mental health crisis spiraled into a preventable mass shooting.

## PARTIES

2.1.    Plaintiff Bobbi Nichols is a natural person residing at 31 Oxford Street, Auburn, Androscoggin County, Maine.

2.2.    Plaintiff is a direct injury victim of, and an eyewitness to, the Lewiston mass shooting that took place on October 25, 2023.

2.3.    Plaintiff was within close proximity and is an eyewitness to the shooting death of her the sister, Tricia Asselin.

2.4.    Defendant is the United States and its agencies, agents, and employees. The United States is responsible for the acts and omissions of the departments and agents and employes of the United States, including the Department of Defense, Department of the Army, United States Army Reserve Command, Keller Army Community Hospital, Robert Card, Robert Card's reserve unit, unit leadership, supervision and chain of command.

2.5.    The chart (Figure 1) below depicts Card's battalion leadership, company leadership, and company members. Those listed in the chart were employees of the United States of America or its agencies at all times material to this lawsuit.

ARMY COMMAND CHART



*Figure 1: Card's Army Command*

## ARMY'S KNWOLEDGE OF MENTAL HEALTH RISKS

3.1.    For decades, the United States has understood that military service creates significant mental health risks for Soldiers themselves and for the American communities to which those Soldiers return to live.

3.2.    The Army understood that the unique stressors of military service–including repeated deployments, combat exposure, traumatic brain injuries, and the transition between military and civilian life–create a potentially dangerous combination of factors that can lead to violence if not managed properly.

3.3.    The Army understood that when Soldiers with mental health crises return to their communities while having access to firearms, there is high risk to public safety because once embedded back in the community the Soldier is not subject to the same level of daily oversight and weapons control protocols that are available to manage Soldiers while on active duty assignment.

3.4.    The Army understood that these risks posed by active-duty and reserve component Soldiers can present a threat to national security and public safety that required systematic prevention measures and rapid intervention protocols.

3.5.    The Army's understanding of these risks crystallized through the pattern of mass violence events and service member suicides that demonstrated the catastrophic consequences of failing to identify and intervene with at-risk service members.

3.6.    For example, on November 5, 2009, Major Nidal Hasan, an Army psychiatrist, opened fire at Fort Hood, Texas, killing 13 people and wounding 32 others. The Fort Hood shooting was a watershed moment that forced the Army to confront the reality that its own personnel could pose threats to military installations and civilian communities.

3.7.    The official investigation into the Fort Hood shooting revealed multiple systemic failures in the Army's ability to identify, assess, and manage Soldiers who posed risks of violence. The investigation found that warning signs had been present for months before the shooting but were not properly recognized or acted upon by military leadership.

3.8.    Following Fort Hood, the Army conducted comprehensive reviews of similar incidents and identified disturbing patterns. The 2012 shooting by Staff Sergeant Robert Bales, who killed 16 Afghan civilians, demonstrated to the Army how combat stress and traumatic brain injuries could manifest in extreme violence.

3.9.    The 2014 shooting at Fort Hood by Specialist Ivan Lopez, who killed three Soldiers and wounded over ten others before taking his own life, showed that the lessons from the 2009 shooting had not been fully implemented. Lopez had a history of mental health issues, but these warning signs were not properly managed.

3.10.    The 2015 shooting at the Naval Reserve Center in Chattanooga, Tennessee, by Muhammad Youssef Abdulazeez, who killed five servicemen, further highlighted the vulnerability of military facilities and the need for better threat assessment and prevention protocols.

3.11.    Each of these tragedies shared common elements that the Army came to recognize as predictive warning signs: mental health deterioration, access to weapons, social isolation, grievances against military or civilian instructions, and a pattern of escalating threatening behavior that was not reported, not properly investigated, or not acted on.

3.12.    After the Card shooting, the Department of Defense Inspector General released an investigation (Report No. DODIG-157) that concluded that the Army had established policies that require medical providers, commanders, and supervisors to report all violent threats to the Army's law enforcement agencies and the chain of command. The report also found that the Army's

installation law enforcement failed to follow established policies that required them to report violent threats to a military criminal investigative organization at a rate of nearly 50%. What's more, the Inspector General concluded that "Failure to consistently report violent threats . . . could increase risk of additional violent incidents by Service members."

3.13.    Parallel to its work on mental health risks, the Army conducted extensive research on the neurological effects of repeated blast exposure on military personnel, including those who worked as range instructors and explosive ordnance specialists.

3.14.    These studies documented that personnel exposed to repeat blast events reported a host of concerning symptoms, including chronic headaches, memory problems, difficulty concentrating, irritability, and aggressive behavior. The research showed that the effects were cumulative, and these symptoms often worsened over time and could persist long after the blast exposure ended.

3.15.    Range instructors were a particularly high-risk population because these Soldiers could be exposed to thousands of blast waves over the course of their careers, creating cumulative neurological damages that might not manifest as obvious symptoms for months or years.

3.16.    Most ominously, the Army research documented that blast-induced brain injuries were associated with increased rates of depression, anxiety, paranoid thinking, and aggressive behavior–precisely the constellation of symptoms that would later be observed in Card.

3.17.    Armed with the knowledge gained from past tragedies and ongoing research, the Army developed comprehensive protocols designed to identify, assess, and manage Soldiers who might pose risks to themselves or others.

3.18.    The Army's mental health screening system required regular assessments of all personnel, with enhanced screening for high-risk populations such as those with combat exposure, traumatic brain injuries, or blast exposure.

3.19.    Army regulations established mandatory procedures for mental health evaluations, including command-directed evaluations when Soldiers exhibited concerning behavior or when commanders received reports of potential mental health crises. The regulations specifically required healthcare providers to notify commanders when service members posed potential risks to themselves or others, creating a communication bridge between medical personnel and command authority.

3.20.    The Army's command structure included multiple layers of notification and intervention requirements designed to ensure that concerning information about service members would reach appropriate decision-makers quickly and trigger appropriate responses.

3.21.    The Army's suicide prevention program included specific protocols for "High Interest" cases– service members who were identified and being elevated risk for self-harm or harm to others. These cases required enhanced monitoring, regular check-ins, and coordination between command, medical, and support personnel.

3.22.    Battalion and brigade commanders were required to maintain awareness of all High Interest cases in their units and to ensure that appropriate interventions were implemented and monitored for effectiveness.

3.23.    And the Army maintained robust procedures for restricting access to military weapons and ammunition by service members who posed potential risks.

3.24.    Army regulations required that service members who had been hospitalized for psychiatric reasons be placed on temporary restrictions, prohibiting access to military weapons and ammunition. Army commanders were required to coordinate with civilian law enforcement and mental health authorities to pursue civil interventions such as involuntary commitment proceedings or civil protective orders that could result in temporary removal of private weapons.

3.25.    The Army recognized that many situations involving reserve Soldiers would require coordination with state and local authorities, since Soldiers spend most of their time in civilian communities under state jurisdiction rather than on federal military installations.

3.26.    Army personnel were specifically trained on the availability of state crisis intervention laws, including involuntary commitment procedures and "red flag" or "extreme risk protection order" laws that allow for temporary removal of firearms from individuals who pose risks.

3.27.    The Army maintained liaison relationships with state and local law enforcement agencies specifically to facilitate rapid intervention in cases involving reserve Soldiers who might pose risks to community safety.

3.28.    Army legal personnel were trained to assist commanders in navigating the complex intersection of federal military authority and state civil authority in cases involving reserve Soldiers' mental health crisis.

**THE ARMY IGNORES CARD'S MENTAL HEALTH CRISIS**

**A.** *Card's Army Career*

4.1.    Robert Card enlisted in the U.S. Army Reserve on December 14, 2002, when he was 19 years old. He completed basic training at Fort Knox, Kentucky, in February 2003, and advanced individual training as a petroleum supply specialist at Fort Lee, Virginia, in May 2003.

*Figure 2: Cap. Jeremy Reamer*

4.2.    Card was assigned to B Company, 3rd Battalion, 304th Infantry Regiment, based in Saco, Maine, where he would serve for over 20 years until his death. His commanding officer was Captain Jeremy Reamer.

4.3.    Throughout his military career, Card received generally positive performance evaluations.

Page 20 of 97

4.4.    Card's official military occupational specialty was petroleum supply specialist, but for approximately nine years, he served in an additional capacity as a firearms and grenade instructor at the United States Military Academy at West Point, New York. In this role, Card was responsible for training cadets in the safe handling and use of various weapons, including hand grenades and firearms. The position required him to spend approximately two weeks each year at West Point during the summer training period.

4.5.    As a firearms and grenade range instructor, Card was exposed to thousands of blast explosions over the course of his career. Each training session involved multiple firearm discharges and detonations of live hand grenades, creating repeated exposure to blast overpressure waves.

4.6.    Army records indicate that Card was present for approximately 180 blast waves per training season during his nine years as an instructor. Over the course of his career, he may have been exposed to over 10,000 individual blast events.

4.7.    This level of blast exposure placed Card within the high-risk population identified by Army research as being susceptible to blast-induced brain injury and associated behavioral changes.

4.8.    The cumulative effects of this blast exposure began manifesting in measurable ways. Card developed significant hearing loss, requiring hearing aids by age 39. By 2023, Card had 75% hearing loss in one ear and 30% in the other.

## B. *July–December 2022: Army knows Card's mental collapse begins.*

4.9.    Card's precipitous and unexplained mental health decline began as early as July 2022, and the Army knew it. By July 2022, but not later than September 2022, Card's unit commander Captain Jeremy Reamer knew that Card was experiencing paranoia, hearing voices, and accusing others of calling him a pedophile and gay.

4.10.    Specifically, Staff Sergeant Sean Hodgson, reported his concerns about Card's mental health directly to Captain Reamer in the summer of 2022.

4.11.    In December 2022, Card continued experiencing auditory hallucinations in which he was hearing voices calling him a pedophile and homosexual. He reported that the onset of these hallucinations came at a local bar where he was playing cornhole three days a week. This bar would become a fixation of his, and he would reference his delusional, purported affronts by its patrons to his medical providers and fellow reserve Soldiers in the months leading up to the shooting.

## C. *March-May 2023: Army learns Card's mental decline worsens.*

4.12.    In March 2023, Captain Reamer received reports from his unit that Card now claimed Soldiers in the unit were calling him a pedophile and gay behind his back. Similar incidents happened in April. Card skipped an annual training validation exercise that month. No one from the Army asked where he was.

4.13.    In early May 2023, Card's 17-year-old son noticed his father's increasingly erratic behavior, anger, and paranoia. He told his mother, Card's ex-wife, and described Card's delusions about being talked about and called gay and a pedophile. Worried about his father's access to firearms and his comments, the son said he was no longer comfortable at his father's house.

4.14.    Card's son and ex-wife reported these concerns to the Mt. Ararat school resource officer, who then reported them to a deputy with the Sagadahoc County Sheriff's Office ("Sagadahoc Sheriff's"). The family told the Sheriff's deputy that Card would respond better if help came from the Army. By then, Card had served for nearly two decades and had a close bond with his fellow reserve Soldiers. The family believed his commanders could exercise legal authority over him. They relied on the Army to identify and respond to a mental health crisis of a fellow Soldier.

4.15.    Likewise, the Sagadahoc Sheriff's deputy decided to involve the Army because the deputy believed that "the armed services are doing a lot of wonderful things with the people that are suffering from PTSD or mental health crisis, and I believe they've come a long way."

4.16.    So, on May 3, 2023, the deputy contacted Card's Army reserve unit and spoke with First Sergeant Kelvin Mote. The deputy told Mote that Card had ten to fifteen handguns and rifles, and Card's son was worried. Mote responded that the Army already knew something was wrong with Card based on prior reports from others in the unit in March and April. For example, Mote knew Card had been involved in an altercation at Home Depot where Card became upset that an old couple "half

*Figure 3: Sgt. Kelvin Mote*

a mile away" was talking about him. The additional information from the deputy "started to concern me," Mote admitted.

4.17.    The next day, on May 4, 2023, Mote spoke again with the Sagadahoc Sheriff's deputy. He learned that Card's brother and sister visited him the night before, and Card answered the door brandishing a gun. Mote told the deputy that if Card is making threats, they should get him to the hospital. Card's ex-wife requested that they inform Army command, but she also wanted them to leave the family out if it because they feared Card's potential reaction. Mote promised the Deputy he planned to meet with Card soon to discuss his condition. Mote also informed the Deputy that the unit planned to attend training with service weapons and was glad he knew about Card's risk with firearms before training.

4.18.    Importantly, Mote also told the deputy that he planned to call Captain Reamer immediately to discuss options to get Card help. Mote assured the Sheriff's deputy that the Army Reserve had a plan to handle Card's situation and were planning to meet with Card at the upcoming May

training on May 6-7, 2023. Despite these assurances, no one in Card's Reserve unit addressed his declining mental health during that May training.

### D. *June 2023: Army knows Card is now in crisis.*

4.19.   On the weekend of June 3–4, 2025, the Army had its next training. Although the Army had promised to handle Card itself, the Army took no action in June, explaining that it had decided to "let the doctors handle the situation." The Army had no information, however, that there were any doctors involved in Card's care, and the Army took no steps to involve doctors or any health care professionals.

4.20.   At the same time, on June 3, 2023, Card's sister called the VA Crisis line. She reported that her brother continued to have paranoid delusions, including claiming that cornhole players and those at the bowling alley were talking about him. The VA Crisis line representative advised Card's sister that telling Army command about her brother's delusions could harm Card's Army career, discouraging Card's family from having the VA take any further action.

4.21.   Between May and July 15, 2023, Card's family reached out to his Army unit at least five times to inform them of Card's worsening mental health. No one from the Army returned their calls.

4.22.   On June 24, 2023, during a change of command for Card's infantry regiment, Captain Reamer didn't tell his higher command about Card's mental health issues or the multiple reports of his risk of violence.

### E. *Early July 2023: Army knows Card is now violent.*

4.23.   On July 6, 2023, Card purchased a .308 Ruger SFAR rifle with a scope, laser, and a 9mm Beretta pistol at the Fine Line Gun Shop in Poland, Maine. This was the weapon he later used to kill 18 innocent people and wound 13 others. When the gun seller went to do a background check

on Card, he had no involuntary hospitalization, felony criminal record, domestic violence protective order, or weapon restriction ("Yellow Flag") order that would have prevented his purchase under Maine or federal law. Had the Army fulfilled its promise to Card's family and the Sagadahoc Sheriff's Deputy to act, it is likely that Card's severe paranoia, delusions, and violent ideations would have been identified and disqualified him from purchasing the murder weapon.

4.24.    In mid-July, despite Card's ongoing severe mental illness, the Army ordered him to attend West Point's annual training, where it assigned him to train cadets using live grenades and firearms. A Sagadahoc County Sheriff's deputy who spoke with First Sergeant Mote was surprised to learn the Army assigned Card to a mission and authorized him to carry weapons–especially since the Army had previously thanked the deputy for alerting them to Card's mental health crisis.

4.25.    For months leading up to the July training, Card's unit lacked leadership. His company commander, Captain Reamer, was absent, and no commissioned officers were designated to take his place.

4.26.    On July 15, Card drove to New York, checked into a hotel, and joined his fellow Soldiers at the pool. He immediately accused the hotel clerk of talking about him and calling him a pedophile. En route to New York, he stopped at a Dunkin' Donuts. He accused the clerk of talking behind his back. Card's fellow reserve Soldiers attempted to convince him that none of this was real. They pointed out that none of the individuals he claims were insulting him had ever met him. Despite their efforts to talk sense into Card, he remained steadfast and unyielding, refusing to be reasoned with.

4.27.    Later that evening, Card, Staff Sergeant Daryl Reed, and Staff Sergeant Christopher Wainwright drove to a nearby gas station to buy beer and pizza. During the ride, Card accused Reed of calling him a pedophile. At the gas station, Card stormed off. Upon returning, he charged

Reed with balled-up fists, looking for a fight. Others intervened to break it up and, on the way back to the hotel, Card kept threatening, "I'll take care of it. It's okay. I'll take care of it."

4.28.   After returning from the convenience store, Reed texted his wife that Card "really has lost his mind." Reed and Wainwright reported Card's alarming behavior to First Sergeant Mote and Master Sergeant Ed Yurek. Mote and Yurek came to the hotel to evaluate Card's condition. Mote later described Card as having a blank, fixed expression–a 1000-mile stare"–that made Mote's hairs on the back of his neck stand up.

## F. *July 16, 2023: Card tells Army, "I am capable" and Army orders Card into involuntary commitment at mental health hospital.*

4.29.   The next morning, July 16, Mote and Yurek returned to the hotel and found Card's condition unimproved. Card continued his rant that people were talking about him and calling him a pedophile. They contacted the New York State Police. When the police arrived, Card told them that the gas station clerk recognized him and called him a pedophile.

4.30.   Card told the State Police that his fellow reserve Soldiers are "scared of me [because] I am capable."

4.31.   The full video of New York State Police interview of Card can be found at the following link: https://youtu.be/E_Ws2vgogKs



*Figure 4: Robert Card*

4.32.    After Card issued this threat, Mote, Yurek, and Reamer (who was phoning-in) ordered an emergency, command-directed behavioral health evaluation ("Command-Directed Evaluation"). They reported their decision to Command Sergeant Major Samuel Tlumac, the senior, non-commissioned officer in charge of B Company's parent battalion, 3rd Battalion, 304th Infantry Regiment.

4.33.    Under Army regulations, a commanding officer cannot order a Soldier to undergo a psychiatric evaluation against his or her will without first making a finding that the Soldier presents a *serious* risk of harm and that such harm is *likely*. In particular, both MEDCOM Policy Memo 22-020 and DoD Instruction 6490.04, require that before a Command-Directed Evaluation can be ordered, Card's commanding officers were required to find the following:

(1) [Card], by actions or words, such as actual, attempted, or threatened violence expresses intent or it likely to cause serious injury to him or herself or others.

(2) the facts and circumstances indicate that [Card's] intent to cause such injury is likely.

Page 27 of 97

> (3) the Commanding officer believes that [Card] may be suffering from a severe mental health disorder.

4.34.   Mote later testified that unit command ordered that Command-Directed Evaluation in July because of Card's delusions, auditory hallucinations, escalating conflict with his friend, the fact that none of his conduct could be attributed to alcohol, and his threatening statement that he was "capable".

4.35.   Captain Reamer's directive to Card to undergo a Command-Directed Evaluation was a military order that Card was required to follow. Violation of that order would have subjected Card to court-martial and possible imprisonment under the Uniform Code of Military Justice (UCMJ). Card communicated his real-time understanding of the compulsory nature of the order, telling his fellow Soldiers, "if it's command directed, I don't have a choice."

4.36.   A credible threat of violence by a Soldier against his peers and the subsequent hospitalization of a Soldier required Card's unit command to submit a Significant Incident Report to U.S. Army Reserve Command with a Commander's Critical Information Requirement. Card's unit command failed to complete these mandatory actions.

4.37.   On July 16, 2023, unit command transported Card to Keller Army Community Hospital (Keller). Mote drove the vehicle, with Noyes and Reed in the second row and Card in the last row to prevent him from escaping. They also asked the New York State Police to escort them to Keller.

4.38.   On the same day, Lieutenant Colonel Ryan Vasquez, Battalion Commander of the unit, discussed Card's hospitalization and diagnosis with Reamer. Throughout the summer, Reamer and Vazquez spoke about Card several more times, but there is no evidence Vazquez or others in command provided meaningful input or supervision on Card's mental illness, self-harm risk, or firearm separation.

4.39.  Upon the arrival at Keller, medical providers placed Card in an examination room and instructed reserve Soldiers to maintain one-on-one watch, ensuring a Soldier always remained with him. To start, Reed kept watch as Card continued his paranoid delusions, now claiming the nurses were talking about him. When Wainwright took over the watch, Card told him that he wanted to beat Reed up and knock out his teeth.

4.40.  In Card's medical records, his "chief complaint" was listed as "I have been brought here because my chain of command wants me to be evaluated." The history included auditory hallucinations, paranoia, delusional thinking, and Card's statement, "I am afraid of what I may do if people still keep bothering me about the so-called voices that I am hearing being homosexual and a pedophile." Further, Card's medical chart noted his symptoms began in December 2022. He lost his girlfriend, job, and enjoyment of cornhole because he could not "be around the people at the bar." He warned that he would act if people continued talking about him. The Keller Army record noted that Card endorsed homicidal ideation. Under "Harm to Others/Violent Behavior," it reported, "yes." The record stated that due to safety concerns regarding his active auditory hallucinations, paranoia, and potential violence, Keller recommended Card for transfer to a higher-level psychiatric facility.

4.41.  Keller Hospital transferred Card to Four Winds Hospital in Katonah, New York. Keller listed its reason for transfer as "enduring homicidal ideation." A Keller physician determined that Card was a "danger to self/others," they endorsed the use of physical restraints during transfer.

### G. *July 16–July 25, 2023: Army learns Card has a "hit list."*

4.42.  Four Winds admitted Card late on July 16 after his transfer from Keller. They noted his history of paranoia, delusions, insomnia, weight loss, auditory hallucinations, and development of

a "hit list." Card's condition was so severe that Four Winds considered placing him in a "locked unit."

4.43.   While confined to Four Winds, Card resisted therapy and psychoeducation. Providers administered various psychological tests, revealing inconsistent coping styles that led to unpredictable behavior. They predicated Card's occasional appropriateness, but his "poor emotional controls" would cause "volatile and extreme reactions" to almost anything. These reactions would impact his thinking, judgment, and behavior–often in a dramatic way. Specifically, Card remained "extremely paranoid" and sometimes delusional. His test scores suggest psychological traits and increasing the risk of violence. They warned of unpredictable reactions in his volatile and extreme fashion. Four Winds warned that psychotropic medications may be of limited value. They also noted that Card's personality made him resistant to treatment, making him a poor candidate for psychological treatment, and his prognosis for significant change guarded.

4.44.   On July 20, First Sergeant Mote drafted a Commander's Critical Information Requirement. This document contains any information that a commander has identified as essential for timely decision-making, triggering system-wide notifications and protective steps. Mote submitted Card's case to the Army Reserve Medical Management Center, which assigned Nurse Case Reviewer Shane Pupo and created a MEDCHART case for Card.[3] The MEDCHART case listed Card's diagnosis as "F329, major Depressive Disorder, Single Episode, Unspecified." However, the Army's Investigation[4] ("Army Investigation") found that the medical records from Keller Army Hospital and Four Winds did not support this diagnosis. Nurse reviewer Pupo emailed unit command with follow-up instructions, but the instructions were ignored.

---

[3] MEDCHART stands for Medical Electronic Data for Care History and Readiness Tracking, intended to track medical readiness, profiles, and disability processing.
[4] Findings and Recommendations, Army Regulation (AR) 15-6 Investigation into the Suspected Suicide of SFC Robert R. Card II (7 March 2024).

## H. *July 25–August 3, 2023: Army command promises to take away Card's weapons but doesn't.*

4.45.    On July 25, Card petitioned for a release within 72-hours from Four Winds. In response, on July 27, Four Winds applied for a court-ordered retention. A hearing was scheduled for August 2, but Card withdrew his petition, causing the hospital to dismiss its petition for a hearing.

4.46.    On July 28, Captain (now Major) Matthew Dickinson (Keller) spoke with Captain Reamer (Card's commander) about discharge planning and ensuring Army Reserve Command include medical staff in medical board and disposition discussions. They also discussed taking Card's weapons: "It was also discussed with Commander about making sure that steps are taken to remove weapons from service member's home to ensure safety."

4.47.    In response, Captain Reamer promised that he was "going to take care of" separating Card from his weapons.

4.48.    However, Reamer did not separate Card from his weapons or ensure that any else did so. Reamer assumed that Staff Sergeant Hodgson might handle the issue. However, Reamer knew that Hodgson was lower ranked than Card, lacked a leadership position in the unit and therefore had no authority to ensure compliance. Moreover, Reamer knew that Hodgson could not himself take

*Figure 5: SSG Hodgson*

personal responsibility for removing Card's firearms, because Hodgson was under bail conditions prohibiting him from possessing firearms. Reamer later admitted in sworn testimony that relying on Hodgson to supervise Card's firearm removal violated Army Command Policy. Captain Reamer had no discretion to abdicate this responsibility to Hodgson. Entrusting Hodgson to transfer weapons violated not only Army policy but also state law.

4.49.    At the conclusion of the conversation, Keller providers emailed Reamer a hard copy of Card's counseling form (DA 4856). Card's Form 4856 constituted military orders, subject to court martial and imprisonment. Reamer had the ministerial and operational responsibility of informing Card of these orders and ensuring compliance, including complying with the portion of the orders directed to unit command.

4.50.    Card's Form 4856 required that unit commanders were responsible for monitoring their Soldiers' individual medical readiness, status, and ensuring compliance. However, Card's unit commanders, including Reamer, violated the 4856's orders by failing to monitor his compliance or address his non-compliance. Reamer never signed the 4856, and Card's Medical Management Center nurse account manager, Shane Pupo, never contacted him to find out why.

4.51.    After nineteen days, at Four Winds, on August 3, Card was discharged. Card's unit relied on Staff Sergeant Hodgson to meet him at Four Winds and drive him back to Maine. Despite being Card's direct commander, having access to his contact information, and being the officer briefed about Card's release conditions by Keller, Captain Reamer failed to facilitate, monitor, or follow up after Card's discharge. Upon information and belief, Captain Reamer did not speak differently to Card following his discharge until September 15.

4.52.    Eight days later, on August 11, Four Winds faxed its discharge summary to Keller. Another ten days later, the Army uploaded those records into their system. The Army's Investigation found that this delay in obtaining and uploading the records violated procedures, because the medical records contained critical information about Card's mental health issue that "would have detailed the extent" of those issues to his chain of command.

4.53.    Reed's wife texted her husband after learning Card had been discharged: "I'm super paranoid about this guy in your unit. If anything ever happened the #1 suspect is Robert Card–just always remember that name."

## I.  *August 2023: Mental hospital discharge, failed firearm purchase, and failure to follow up.*

4.54.    After his discharge from Four Winds on August 5, 2023, Card attempted to buy a silencer from Coastal Defense Firearms in Auburn, Maine. This act on the immediate heels of his discharge from a psychiatric institution reflected Card's lack of improvement and foreshadowed the ongoing threat of violence. To complete the purchase, Card was required to complete ATF Form 4473. One of the questions on the form asks: "Have you ever been adjudicated as a mental defective OR have you ever been committed to a mental institution?" (See Instructions for Questions 11.f) Card answered this question, "Yes," indicating that Card himself believed that he has been committed to a mental institution. Because this admission made Card a person prohibited from purchasing firearms under Federal law, the store denied the sale. Of course, Card did not run into this issue when he purchased the Ruger SFAR AR-10 on July 7, 2023, because his command had failed to properly address his mental health crisis before that date.

4.55.    Following discharge, Keller Army Hospital providers called and left voice messages for Card on August 7, 8, 15, 21, 23, 29, and 30. None of those calls were returned. But on August 11, 2023, during their sole conversation, Card admitted he was not taking his medication and would not go for follow-up treatment.

4.56.    Card's chain of command failed to contact him or follow up on the mandatory requirements that applied to both Card and his chain of command after his discharge. Eventually, a nursing note from September 21 states a call was placed to Card to follow up, but no call back was received.

The Keller chart states the case was closed due to noncompliance with communication. The Keller providers did not report to his unit command Card's lack of compliance, lack of follow up, or refusal to medicate.

## J.  *September 2023: Army learns Card threatens mass shooting.*

4.57.   At 2:30 AM on September 13, SSG Hodgson called Sgt. Mote to report that Card complained of being called a pedophile again during a casino trip. Card told Hodgson he could use his new scope to kill 100 people and listed places he could "shoot up." Card threatened to "shoot up" the drill center in Saco and other places. Hodgson told Card to "knock it off" because Card "was going to get into trouble talking about shooting up places and people." In response, Card punched Hodgson and left the vehicle.

4.58.   Two days later, in the early morning hours of September 15, Hodgson sent Sgt. Mote a text message:

> You up i have something to report.
>
> Change the passcode to the unit gate and be armed if sfc card does arrive. Please. I believe he's messed up in the head. And threaten the unit other and other places. I love to death but i do not know how to help him and he refuses to get help or to continue help. I'm afraid he's going to fuccck up his life from hearing things he thinks he heard. When i dropped him off he was concerned his weapons were still in the car. I believe they were at the unit. And no one searched his vehicle on federal property.
>
> **And yes he still has all of his weapons**. I'm not there I'm at my own place.
>
> **I believe he's going to snap and do a mass shooting**.
>
> (emphasis added)

4.59.   Mote found Hodgson's account credible because it squared with his recent experience with Card. As in July, Card's new threat "caused the hairs on the back of [Mote's] head to go up." Mote believed Card was "off his rocker." Mote believed that Card's threats were consistent with the concerns triggering his and Reamer's decision to order the Command-Directed Evaluation in July.

He believed Card's mental illness persisted and the same issues that led to the July Command-Directed Evaluation order were ongoing and unresolved. Mote believed Card remained a threat to himself and others. Based on his 24 years of law enforcement experience and knowledge of Card, Mote understood that there was probable cause to take Card into protective custody and remove his weapons under Maine's Yellow Flag law. But Mote chose not to discuss the Yellow Flag law with Reamer after receiving Hodgson's text. And Mote did not communicate his understanding that the Yellow Flag law should be used to separate Card from his firearms to local law enforcement.

4.60.     In response to Hodgson, Mote spoke with Reamer, who asked him to request a "well-being" check on Card. Mote contacted Sgt. Maj. Tlumac, forwarded the text message, and explained that they should consider it a critical threat. Tlumac agreed. Next, Mote spoke with Core Bagley, an Ellsworth Police Department detective. Bagley contacted the Sagadahoc Sheriff's office and spoke with Deputy Aaron Skofield. Begley told Skolfield the Army was requesting a "wellbeing check" on Card. Begley provided Skolfield with a summary of Card's history and circumstances and forwarded a letter prepared by Mote, which also attached Hodgson's text message. Mote's letter reads:

> Good afternoon,
>
> I received the attached text this morning from SSG Hodgson in reference to Sergeant First Class Robert Card DOB 04-04-83. Card is one of my senior firearms instructors in Bravo Company 3/304 in Saco. Card has been hearing voices calling him a pedophile, saying he has a small dick, and other insults. This hearing voices started in the spring and has only gotten worse. On July 15 2023 while at West Point Card was hanging out with several other Soldiers at the hotel they were staying at. They had gone to a convenience store to get some beer. In the parking lot Card accused three of them of calling him a pedophile and said he would take care of it. One of the Soldiers who has been friends with Card for a long time was there. Card got in his face, shoved him, and told him to stop calling him a pedophile. They got their beer, calmed Card down a little, and made their way back to the hotel. Several times on the ride back Card said he would take care of it. When pressed about what he meant by that Card didn't respond. Present during this was Oxford County Sheriff

Christopher Wainwright and Androscoggin County Deputy Matthew Noyes, both are in my unit as well. Once they got back to the motel, Card locked himself in his room and would not answer the door when they tried to make contact. I was informed about this incident early the next morning. I met them at the motel along with a couple other Soldiers and we were able to get the key to the room and make contact. Card said he wanted people to stop talking about him. I told him no one was talking about him and everyone here was his friend. Card told me to leave him alone and tried to slam the door in my face. One of the Soldiers stopped the door from closing with this foot. I decided, after talking with my commander, that Card needed to be evaluated. We took him to the base hospital where he was seen by a psychologist there and determined to need further treatment. Card was taken to Four Winds Psychiatric Hospital in Katonah NY for treatment and evaluation. During the four hours I was with Card he never spoke, just stared through me without blinking. He spent 14 days at Four Winds then was released. To my knowledge he has not sought any more treatment since being released. Night before last, at approximately 0230, another Soldier that is friends with Card called to tell me that Card had assaulted him. They were driving home from the casino when Card started talking about people calling him a pedophile again. When Hodgson told him to knock it off because he was going to get into trouble talking about shooting up places and people, Card punched him. Hodgson was able to get out of the car and make his own way home. According to Hodgson, Card said he has guns and is going to shoot up the drill center at Saco and other places. He also said he was going to get "them." Since the commander and I are the ones who had him committed we are the "them." He also said I was the reason he can't buy guns anymore because of the commitment. Hodgson is concerned that Card is going to snap and commit a mass shooting. (see the text message attached) Captain Reamer, 3/304th commander, asked that I have Sagadahoc County conduct a well-being check on Card at his residence, 941 Meadow Road in Bowdoin Maine, to gauge his mental health and determine if he is a threat to himself and/or others. I relayed this to Deputy Chief Troy Bires and he advised to have a detective make the request to the SCSO to conduct the well-being check. I have attached the text message and current photograph of Robert Card to this email. The Saco PD has been given a heads up about this and the battalion commander has been briefed as to the threat to the unit in Saco. I would rather err on the side of caution with regards to Card since he is a capable marksman and, if he should set his mind to carry out the threats made to Hodgson, he would be able to do it.

4.61.    Sgt. Mote later testified that his letter was "basically . . . a probable cause statement" – "that's why this is so lengthy." However, Mote never spoke directly to anyone at the Sagadahoc Sheriff's Department or told anyone he was requesting they exercise Maine's Yellow Flag law.

4.62.    Mote also omitted critical facts from his letter. First, the Army revoked Card's access to military weapons because it deemed him a safety risk. Mote later acknowledged this crucial information would have been vital for the Sheriffs, but he did not provide it because "it did not

come up." Perhaps more significant, Mote failed to mention that Card's doctors at two hospitals that evaluated and treated his mental illness expressly required the removal of his personal firearms for his discharge.

4.63.   Later, on September 15, Reamer spoke with Card. By then, the Army command had failed to follow through on its promise, made months earlier, to secure Card's weapons. In this conversation, Card voiced continuing anger over the summer's events and said he still wanted to assault Staff Sgt. Reed. He also told Reamer he would not attend battle assembly the next day. Card's 3822 required his commander to increase supervision and support measures meant to keep Card engaged with unit members and with care resources. Yet, Reamer did not order Card to attend battle assembly. Nor did Reamer question Card on reports that Card threatened mass violence, or on whether he was keeping medical appointments or taking prescribed medications. Even worse, Reamer neither acted to remove Card's weapons, nor asked whether he still had access to them.

## K. *The Army protects itself, but not the public.*

4.64.   In response to Card's threats to commit a mass shooting, unit command asked Saco Police to provide support for Army training facilities to protect themselves against Card. As a result, the Saco police showed up and remained on the premises on September 16, guarding Army facilities against a mass shooting threat from Card.

4.65.   Card did not show to the September 16 training. Two Saco police officers spoke with Ramer about Card's threats. Reamer told the police officers that he had talked to Card and Card was angry but never made any specific threats. "He's still angry about what's happened over the summer." Reamer downplayed Card's dangerousness and cast doubt on Hodgson's warnings, stating that Hodgson was unable to "really give any specifics" because while he said Card would

shoot places, he "never specifically mentioned" the Army Reserve Center or any other place "specifically."



*Figure 6: Captain Reamer*

4.66.   Reamer also questioned Hodgson's sobriety because he sent the text message at 2 AM.

4.67.   The Saco police said: "They've had us all basically staking out the place. . . . we just want to know if that needs to continue." Reamer told them that was unnecessary and that they would give the officers a call if Card showed up to training. Then, Reamer said: "He does have mental health issues. You know, I'd say schizophrenia seems to be what it is. He's delusional."



4.68.    Hodgson had specifically stated that Card threatened to shoot up the Army drill center, contradicting Reamer's statement. Reamer did not share Hodgson's texts with the Saco police. Nor did Reamer ask the Saco Police to charge Card with criminal threatening, or charge him for his assault on Hodgson.

4.69.    As a result of Sgt. Mote's request through Ellsworth Officer Bagley, Sagadahoc Sherrif's Deputy Skolfield went to Card's trailer to attempt to locate him.

4.70.    Before intervening, the Deputy spoke to several people. First, he spoke to Card's brother, Ryan Card and his wife, Katie.



*Figure 7: Deputy Skolfield*

4.71.    Deputy Skolfield also spoke with Sgt. Mote. Mote claimed Hodgson was an "alarmist" at the time. In response, Deputy Skolfield said that he wanted to speak with someone higher up in the command. Mote gave him Reamer's phone number. But after speaking with the Deputy, Mote called Reamer. They discussed whether alerting the Saco police was the right thing to do, as it had escalated the situation.

4.72.    At 10:46 AM, Captain Reamer telephoned Deputy Skolfield, who was still parked in view of Card's driveway. Skolfield recorded their conversation on his cruiser's surveillance camera. Deputy Skolfield informed Reamer that he was concerned about reports of Card's potential mass shooting, his hallucinations, his recent "institutionalization," and the lack of improvement in his mental state. The Deputy asked Reamer, "All of his weapons from the National Guard had been accounted for, right? So, he doesn't have anything at the house?"

4.73.    Reamer responded as follows:

> So in terms of all the weapons, this is kinda how it went down as far as I know. Um, there was no real court order to take his weapons or anything like that, so what was required was when he went to the institution, um, over there, they -they - part of the thing is - which I wasn't even a part of, uh, to, mind you, like they didn't keep me in the loop on any of this 'cause of HIPAA. Um, but the family was supposed to, uh, take care of all the weapons and move it. Um, obviously I lived in New Hampshire, so I was unable to obviously verify any of it. Um, so as far as I know, his weapons, I was told, his weapons had been moved, um, out into a family member's, um, place. Um, whether he has access to those at the family members', I don't know. But that's what, um, as far as I know, any weapons he had were supposed to be moved by, um, his friend, um, Hodgson, who kinda started this whole thing. And then, uh, his - his brother, um, Ryan Card, which I have his contact information too.

4.74.   Much of this statement is false. In fact, Reamer was very much "a part of" Card's commitment to a medical facility. Keller did keep him "in the loop" of Card's case. He was entirely able to verify any number of facts about the Soldiers underneath his direct command authority. HIPAA did not prevent Reamer from receiving information related to a Command-Directed Evaluation that he himself directed. Reamer also failed to disclose that the Army had promised to separate Card from his firearms, as recommended by Keller Army Hospital and Four Winds providers.

4.75.   Next, Reamer stated that he had spoken with Card the prior day:

> Um, he called me after he kinda confirmed he wasn't gonna come up to - after we kinda started this wholething initially, he called later on. Uh, and stated that, you know, he wasn't gonna come to drill. Um, and I was like, okay that's - that's fine. Uh, he – he sounded angry, um, definitely angry at people but made no specific threats like "I'm gonna come there and shoot if nobody does" -I mean nothin' like that. It was not even, he's just "I'm pissed off at how everything went, no I gotta work," um, because of how everything went down there at West Point. He never said any specific names, he never said anyone specific, he didn't target any specific sites, or anything like that.

4.76.   Then, Reamer stated that he had just spoken with Vazquez and Tlumac:

> Um, and, we kinda went through hashed it out and as far as they're concerned, they - they said like as long as you can kinda – if you're out there he's - he's there, he can be uncooperative or whatever but there's no sense in you guys pushing in and- and regard, we just wanted to check wellbeing if you can kinda tell he's there and alive just kind of document it. … So that - that's what I mean we don't - from our end here we don't - and I'm - I'm a cop myself. Um, I don't want you guys to push into something um, and - and escalate it past something at the moment.

4.77.   Reamer went on to explain that when they tried to fact check the text message received from Hodgson, "he was unable to even give specifics on, during that, so I don't know like what, like, the – validity of the text message is." He noted that they were taking the text message seriously, but "with a grain of salt as well" because "we know where the source is coming from so it's kind of what we were really looking– the goal of it was. Was just to kind of make sure he's you

know, where he's at, make sure he's good, alive, um, and then just if we can document it and we can go from there." In other words, Reamer advised Deputy Skolfield that there was no reason to confront Card or enter Card's home and that the Army only needed the Deputy to create a paper trail documenting that Card was alive.

4.78.    Deputy Skolfield explained Maine's Yellow Flag Law to Captain Reamer during their call. He testified that the Army led him to believe the situation was not as serious and discouraged him from taking Card into custody for medical evaluation or using Maine's Yellow Flag law. In the End, he acted as Reamer advised, taking Hodgson's report of Card's mass shooting threat with a grain of salt and not entering Card's house.

4.79.    Given the Reamer conversation and because it took the Army over sixty hours to report the incident, Deputy Skolfield told dispatch that "it was not as urgent as it originally sounded when it was given to us" because when dispatch received the report, they were led to believe it was time sensitive. In fact, before Reamer intervened, Deputy Skolfield planned to spend much time dealing with Card. He arranged for another deputy to cover his day off while he focused on Card. Deputy Skolfield later testified that the Army convinced him not to conduct a welfare check on Card. Deputy Skolfield also noted that Reamer and Mote failed to inform him of the physicians' determination to restrict his personal firearms and remove his access to military weapons, which would have influenced his probable-cause analysis. Unfortunately, this information, along with other crucial information, was not shared with Skolfield and no one from the Army asked him or any member of the local law enforcement to use Maine's Yellow Flag law to have Card brought in for further mental health evaluation.

4.80.   Before Reamer intervened and minimized the threat, Deputy Skolfield had intended to enter Card's home for a welfare check and exercise Maine's Yellow Flag law to retrieve Card's weapons.

4.81.   After September 16, Mote and the unit had no contact with Card, despite knowing Card had alienated Sergeant Hodgson, which heightened Mote's concern for Card's mental state. No one from the Army contacted the Sagadahoc Sheriff's Department. Nor did anyone from the Army send the new concerns up the chain of command.

## L. *October 2023: Card misses mandatory training and Army does nothing.*

4.82.   In October, Card missed training again. Despite the order to closely monitor Card, Reamer failed to contact him to find out why he missed it or order him to attend.

4.83.   On October 17, the Army administratively extended his 90-day profile. This violated Army Regulation 40-502, which mandated an evaluation of Card 90 days from the change to his profile.

4.84.   Following Card's threats in mid-September, his severe mental illness persisted, evidenced by ongoing paranoia, delusions, violent ideations, and lack of emotional and impulse control.

4.85.   For example, on October 19, 2023, Card accused employees of a trucking company to which he was delivering a package of talking about him. One employee told police Card confronted him and warned he might "snap" on him. On October 22, Card wrote a lengthy, rambling message on his smartphone, fixated on delusional belief that his ex-girlfriend and others in the cornhole league were continuing to slander him. He wrote, "I'm having issues. I've had enough. I'm trained to hurt people."

4.86.   In a letter dated October 23, two days before the mass shooting, Reamer wrote Card to inform him that he had accrued twelve unexcused absences within a one-year period. (The limit is

nine.) The letter states, "I hope as a result of this letter you will take immediate steps to improve your attendance."

### M. *October 25, 2023: The Lewiston Mass Shooting.*

4.87.   On October 25, 2023, armed with a Ruger AR-10 rifle, Card entered Just-in-Time bowling alley and Schmengees Bar and Grille in Lewiston, Maine, opened fire on large groups of innocent men, women, and children. Two local institutions that were sanctuaries of community and fun for Lewiston turned into the most gruesome crime scene in Maine's history.

4.88.   The bowling alley and local bar Card targeted were not random or arbitrary. They were locations that Card had frequented many times to participate in bowling and cornhole leagues. But in his illness-ravaged mind, these local haunts were filled with people conspiring against him and places where Card, in his delusional rants, had told his fellow reserve Soldiers and medical providers that he would have to do something about it if it didn't stop.

4.89.   Plaintiff's sister, Tricia Asselin, was one of the lives ended at Just-In-Time Recreation. The seven other people killed at the bowling alley were: Thomas Conrad, Jason Walker, Michael Deslauriers II, Robert Violette, his wife Lucille Violette, fourteen-year-old Aaron Young, and his father, William Young.

4.90.   Plaintiff Bobbi Nichols was present at Just-In-Time and eye-witnessed all that occurred, including the killing of her sister, Tricia Asselin.

4.91.   As gunfire echoed through the bowling alley, Bobbi Nichols dropped to the floor. Looking around in a panic, she watched as Card shot and killed her sister, Tricia Asselin. Trying to get back on her feet, Bobbi was trampled and physically injured by people rushing toward the exit. While on the ground, a victim who was fatally shot by one of Card's bullets collapsed on top of, and bled

out on, Plaintiff Bobbi Nichols. Moving the body, Plaintiff Nichols rose to her feet, ran toward the exit, and exited the building—shots continued to be fired throughout the bowling alley.

4.92.    Card left the bowling alley and drove to Schemengees Bar and Grille, a place that hosted the local cornhole league in which Card had participated. Schmengees also was a vital gathering spot for Maine's deaf community. That evening, several members of the deaf community were gathered to play cornhole.

4.93.    Card entered Schmengees, and in seventy-eight seconds, fired thirty-six rounds, killing ten and wounding many others. Those killed at Schmengees were Joseph Walker, Arthur Strout, Joshua Seal, Ronald Morin, Stephen Vozzella, Keith Macneir, Bryan MacFarlane, Maxx Hathaway, Peyton Brewer-Ross, and William Brackett.

4.94.    On October 27, two days after he committed the mass shooting, Card was found dead from a gunshot wound to the head that was ruled a suicide.

4.95.    The eighteen people Card killed in the worst mass shooting in Maine history ranged in ages from fourteen to seventy-six. They are parents and grandparents, husbands and wives, brothers and sisters, children, veterans, Soldiers, youth coaches and umpires, avid outdoors men and women, community leaders and volunteers, athletes, dart and cornhole champions, sign language interpreters, local business owners, truck drivers, and postal carriers.

4.96.    In short, those killed represented a broad cross section of the people who make up the fabric and heart of the community in and around Lewiston, Maine.

## THE ARMY'S FAILURES

### A. *The Army delayed initiating a Command-Directed Evaluation*

#### i.    The Army knew early on Card was having a mental health crisis.

5.1.    As early as July 2022, and certainly no later than March 2023, the Army failed to follow mandatory regulations in the handling of Card's mental health crisis.

5.2.    In July 2022 and then again in March 2023, Captain Reamer learned that Card believed people were calling him a pedophile and gay, including Soldiers within his own unit.

5.3.    Card had been making these types of statements to employees or agents of the United States as early as December 2022. Chillingly, in December 2022, Card reported that the onset of these hallucinations came at a local bar where he was playing cornhole three days a week. This bar would become a fixation of his, and he would reference his delusional, purported affronts by its patrons to his medical providers and fellow reserve Soldiers in the months leading up to the shooting. The bar was Schemengees.

5.4.    As the unit commander, Reamer and others were required by Army regulations to take specific actions to ensure their unit's and individual service members' integrity and safety. Even if Reamer was unaware of Card's declining mental health, Army regulations require command intervention upon a report of a Soldier being called gay and pedophile by peers and feeling bullied enough to report it.

5.5.    Specifically, under Army Regulations 600-20 and 40-502, Reamer had several responsibilities, including reporting "disposition of offenses investigated during a command investigation or inquiry under their authority," reporting information that might impact a service member's security clearance or reliability, investigating and resolving complaints or accusations

against military personnel, reporting insider threats, and ensuring Soldiers' medical fitness standards are met.

5.6.    Moreover, per Army Regulation 600-20, ¶ 4-19, Reamer was required to prevent abusive treatment of others and seek advice from his legal advisor when implementing the Army's Harassment Prevention and Response policies.

5.7.    So, as the unit commander, Reamer was obligated to investigate a report of harassment by a Soldier. If he had, Reamer would have determined that other Soldiers were not, in fact, harassing Card, but that Card was showing signs of mental deterioration. Indeed, Card reported to his fellow reserve Soldiers that he believed he could hear others speaking ill of him, despite these Soldiers being between 40-100 feet away.

5.8.    But Reamer ignored these regulations and failed to investigate the alarming report of Card's harassment.

5.9.    Had Reamer acted, he would have identified that Card was hallucinating, which would have resulted in an emergency, command-directed behavioral health evaluation ("Command-Directed Evaluation") in March 2022, over one year before the Lewiston shootings. With respect to Army Reserve members, MEMDCOM Policy Memo 22-020 provides that a Command-Directed Health evaluation "is an order." The commander notifies the service member of "the time, location, and name" of behavior health professional for the execution of the examination.

### ii.    The Army promised Sagadahoc Sheriff's and the Card family they would intervene.

5.10.    In May 2023, after the Card family contacted the Army via Sagadahoc Sheriffs, the Army promised to intervene in Card's mental health crisis. Despite the family following up with the

Army throughout the summer; no one returned their calls. And despite the Army's promises, no one in Card's reserve unit addressed his declining mental health during May training.

5.11.   Captain Reamer was informed about Card's mental decline– Sgt. Mote told him that Card had a confrontation at Home Depot, where he thought people were talking about him. Reamer did not act on this information; instead, Reamer missed the April, May, and June trainings, leaving no one else in command in his absence.

5.12.   Sgt. Mote saw Card at the trainings, but he did not talk to Card and could not recall anyone talking with Card between May 4 and July 15. What's more, despite the Sagadahoc Sheriff's deputy providing Card's brother's phone number, neither Mote nor Reamer contacted Card's brother. And despite Mote's prior statement that Card needed hospitalization, no action was taken to refer Card for medical evaluation. In fact, at this time, Mote was unaware of the Army regulations relating to ordering an emergency, Command-Directed Evaluation.

5.13.   The Army's May training marked one of many opportunities to intervene in Card's mental health crisis, but they failed to do so. First, Card's chain of command assured his family and local authorities they would act on the information they had. Second, Mote and Reamer knew Card suffered from a serious medical issue with hallucinations and mental decline. Third, Card was under the Army's authority during the May training, so he could have been subject to interventions from informal to a Command-Directed Evaluation. Again, they did nothing.

5.14.   Had the Army initiated a Command Directed Evaluation–even as late as May 2023, either because of the mandatory regulations requiring it or its assurances to the Card family–it likely would have led to Card's commitment to a mental health facility, with multiple consequences for Card and the Maine community. Given Card's condition, any reasonable evaluation would have determined that he was suffering severe mental illness, posed significant risk to himself and others,

and required hospitalization, treatment, and separation from his firearms. Thus, if the Army had followed its own mandatory regulations, investigated Card's conduct and/or fulfilled its promise to Card's family and local law enforcement, it is likely that steps taken as early as Spring 2023 would have prevented the October 25 mass shooting.

## B. *Once committed, Card's hospitalization required follow through.*

5.15.    When the Army eventually initiated a Command-Directed Evaluation and took Card to Keller Army Hospital, it undertook responsibilities under mandatory regulations and it undertook responsibilities when it promised providers that it would follow up on Card including retrieving any weapons Card had access to.

### i.    Risks of Service-Related Exposure to Blast Explosions

5.16.    By 2023, Card had been a member of the Army Reserve for over twenty years. But until 2022, Card was a valued member of his reserve unit. The Army found no prior misconduct or performance deficiencies. His unit members described him as kind, friendly, calm, and generous. The Army's Investigation concluded that Card had an unremarkable twenty-year military career.

5.17.    However, despite the DoD's knowledge of the risks and Card's years of exposure to repetitive blast forces during live fire and grenade training, and Card's precipitous and unexplained onset of mental illness, the Army never explored whether his sudden decline was due to physiological brain changes, or, if so, what the implications of that were for the risks Card posed to himself and others.

5.18.    Indeed, following his death, Card's brain underwent pathological analysis, revealing evidence of a brain injury with damages to white matter, degeneration, axonal and myelin loss, inflammation, and small blood vessel injury. The findings aligned with previous studies on the effects of blast injury in humans and experimental models.

5.19.    Of course, the Army itself performed no evaluation or medical workup of Card's sudden mental health decline. Also, Card was experiencing well-documented hearing loss during this time, and at a young age. Hearing loss is a well-known and relatively common symptom of a traumatic brain injury. And Card's hearing loss was so severe that by 2023 he required a hearing aid. The Army was aware of this yet remained uncurious at what could be causing his rapid mental decline and hearing loss.

5.20.    Well over six months before the shooting, the Army knew about Card's paranoid delusions, auditory hallucinations, grossly disorganized behavior (e.g., showing his co-worker pictures of his penis), social and occupational dysfunction, aggressions, rage, and violence. Given the Army's knowledge of Card's history of repeated blast exposure, it would have been required to evaluate Card's brain injury had the Army followed its mandatory Line of Duty and Medical Board regulations.

### ii.    Command-Directed Commitment

5.21.    Second, when the Army orders an emergency, Command-Directed Evaluation, the responsibilities extend beyond the initial referral. Army policy requires follow-up to implement a plan of care or action. MEDCOM Policy Memo 22-020 mandates that Behavioral Health Providers use DA Form 3822 to document Evaluation results to commanders, stating it's the only authorized form for MTF BHPs to report behavioral or mental status.

5.22.    Here, Keller providers completed DA Form 3822 "Report of Mental Status Evaluation" and sent it to Reamer after Card's evaluation at Keller. Reamer also received a hard copy at Keller. Card's Form 3822 states that Card does not meet medical retention standards, has "reached medical retention determination point," and a Disability Evaluation System referral is indicated. Pertinent findings include impaired cognition, perception, behavior, and abnormal impulsivity. During the

interview and report, Card was positive for auditory hallucinations and paranoia. A diagnosis of "unspecified psychosis not due to a substance or psychological condition" is listed.

5.23.    Importantly, Card's 3822 required that Card and his unit command:

a.   Follow up with case manager and brigade surgeon.
b.   Ensure that Card attends all follow-up appointments.
c.   Increase leader/supervisory support with intent of keeping Card engaged with unit members and other sources of support.
d.   Consider placement of service member in barracks for increased support and potentially reduced access to weapons.
e.   Restrict access to or disarm all military weapons and ammunition. No range duties.
f.   Ensure that measures be taken to safely remove all firearms and weapons from Card's home.

### iii.    Line of Duty Investigation and Medical Evaluation Board Review

5.24.    Third, the Army failed to perform a "Line of Duty" Investigation or Medical Evaluation Board Review after discharge from Four Winds. The Army's Investigation into the mass shooting found that Card was discharged from Four Winds and released from his orders under "questionable circumstances."

5.25.    For example, the Army Investigation concluded that the Army should have kept Card on active duty until the Line of Duty Investigation and the Medical Evaluation Board's review were complete. Army Regulation 600-8-4 describes Line of Duty Investigation requirements and procedures. Reserve Soldiers receive "hospital benefits, pensions, and other compensation" like regular army Soldiers for injuries, illnesses, or diseases incurred in the line of duty. Prior illnesses can be aggravated in the line of duty. In making this "line of duty" determination, "mental soundness can only be determined by a behavioral health expert." A Line of Duty Investigation is performed to "determine duty status at the time of incident and whether misconduct was involved and, if so, to what degree." It also determines if a condition existed before service and its impact on service aggravation. The Army must collect and establish evidence conclusively and accurately.

5.26.    Given Card's severe diagnosis and that he had reached a medical retention determination point, Army regulations require that Keller providers initiate a permanent profile and refer Card to the Disability Evaluation System process immediately.[5] Additionally, the initiation of a permanent profile would have caused Card to remain on active duty through the conclusion of the Disability Evaluation System process.

5.27.    DoD Instruction 1332.18 is the mandatory policy for the Disability Evaluation Board reviews all available medical evidence, including Disability Evaluation processing examination, to determine if a service member has medical conditions that prevent them from performing their duties. The Army violated its policies and Card's 3822 requirement by failing to complete a Line of Duty Investigation and Medical Evaluation Board review, as found by the Army's Investigation of this shooting. As Card needed ongoing medical care for his unresolved mental illness, his orders were required to be extended until these administrative processes were complete, including a determination of whether his mental status changed due to military service, and his condition was medically treatable, thus determining his fitness to continue service.

5.28.    The Army should have investigated Card's sudden mental health decline. Card should not have been released from his orders until the investigation was complete, and the root causes were identified. Yet, despite Card's Form 3822 stating he does not meet medical retention standards, has reached the determination point, and needs a Disability Evaluation System referral, no Line of Duty Investigation or referral was completed. Had the Army followed the mandatory Medical Evaluation Board process, Card would likely have been adjudicated by the Board to be a danger

---

[5] A profile is a formal medical classification documenting a Soldier's physical or mental health limitations and their impact on military duties. Temporary profiles, like the one Card was given, are issued when conditions improve, allowing recovery without permanent restrictions. A permanent profile is issued when the medical condition is considered chronic, stable, and unlikely to improve, and it impairs the Soldier's ability to meet medical retention standards. Permanent profiles trigger a mandatory review to determine whether the Soldier can continue to serve– through the Disability Evaluation System process.

to himself or others, making him ineligible to buy or possess a firearm under federal law. In turn, the Army would be required to report him to the FBI's NICS databank, flagging him nationwide as unable to legally own firearms.

### iv. Failure to Secure Firearms

5.29.  Fourth, the Army did not take and secure Card's firearms following discharge from Four Winds Hospital.

5.30.  Card's Form 3822 ordered the removal of all firearms and weapons from his home. Captain Reamer, on behalf of the Army, promised to do so as a condition of Card's discharge from the psychiatric hospital back into the community.

5.31.  According to a timeline prepared by the Army, as of July 25, while Card remained hospitalized in New York, "Sergeant Card agreed to have his weapons removed." Card's consent and his status as active-duty reserve removed any legal or other obstacles to the removal of his weapons, including the weapon used in the shooting on October 25, 2023. Either before or upon discharge, the Army was required to comply with the order in Card's 3822 by removing his firearms.

5.32.  Even if Card had not consented, the Army was still required to fulfill its promise to remove his firearms through any legal process available to fulfill this commitment. For example, New York's Extreme Risk Protection Order, NY CPLR 6340, et seq., (also known as NY's Red Flag Law), provided a mechanism for Keller Army medical providers to ensure that its mentally ill patient would be separated from his firearms, as they had explicitly recommended in Card's 3822. Had the Army followed this process, it would have led to a court order prohibiting Card from purchasing or possessing firearms that would have resulted in Card being flagged as a "prohibited person" in the FBI background search database–information that would have been later available

to gun sellers and law enforcement in the State of Maine. Not only that, but Maine law enforcement would also have been able to use that order to remove Card's personal firearms, including the weapon used in the shooting on October 25, 2023.

5.33.   Army could have ensured the removal of Card's weapons by notifying local Maine law enforcement, providing relevant history, and requesting their removal under Maine's Yellow Flag Law. Sgt. Mote later testified, he understood that this should have been done. Had the Army done so, a Maine Court, presented with the history and recommendations of Card's treating doctors, would have entered an order prohibiting Card from purchasing or possessing firearms.

5.34.   Instead, despite assurances to Four Winds and providers at Keller, the Army did not remove Card's firearms. As a result, Card continued to have access to numerous firearms even after his discharge from the psychiatric hospital. The murder weapon that he purchased on July 6 remained in his possession. As Sagadahoc Sheriff's Deputy Skolfield later wrote, "Reamer failed to notify any other agency, including the [Sagadahoc Sheriff's office], of the situation with Mr. Card upon his discharge from Four Winds and his recommended weapons restrictions.

5.35.   In short, the Army represented that it would take action to ensure the removal of Card's personal firearms. It undertook that responsibility in connection with the conditions under which Card was discharged from his hospitalization following the Army's own Command Directed Evaluation and hospitalization. It breached its undertaking to do so.

### C. *The Army failed to act on specific threats of mass shootings.*

5.36.   In response to the early morning call from Hodgson on September 13th warning Army command that Card had threatened to commit a mass shooting, the Army failed to follow procedures and actively dissuaded others from intervening.

5.37.    The Army had long standing knowledge of Card targeting the bowling alley, Just-in-Time Recreation, and the bar, Schemengees. The Army even knew that Card had a "hit list" –yet the Army did nothing to warn those on the hit list or who frequented the establishments targeted by Card of Card's intentions.

5.38.    To begin, upon receiving these threats, Reamer and Army command failed to contact the Army Criminal Investigation Division and the Insider Threat Program (Hub). The Criminal Investigation Division is the Army's law enforcement agency, while the Insider Threat Hub is a security program within DoD that identifies and responds to risks posed by individuals with authorized access. An insider threat, like Card's, triggers multiple mandatory reporting grounds, including "personnel exhibiting behaviors that may be a predictor of workplace violence." Card's Army command failed to report Card's threat through a "serious incident report" as required by Army Regulation 190-45, which the Army Investigation found to violate regulations. Card's behavior in September threatened others and indicated a risk of self-harm. Army Regulation 600-92 mandates that unit commanders address any risk of service member suicide. The Army likewise ignored that obligation, and Card later committed suicide.

5.39.    Finally, Card's mass violence threats in September also triggered a requirement that his unit commander take steps to change Card's security clearance. Under Army Regulation 380-67, Reamer should have sent a Report of Unfavorable Information DA Form 5248 to the Commander of the Central Clearance Facility, which is responsible for managing security clearances for Army personnel.

5.40.    Had the September threat been reported, it would have required specific follow-up as mandated by Government regulations. First, it would have been directed to the Deputy Chief of Staff and Assistant Deputy Chief of Staff in the U.S. Army Reserve Command headquarters, under

a three-star general with overall command of the Army Reserve. Mandatory serious incident reporting in September would have triggered actions at the command level to address the specific risks posed by Card, especially since this would have been at least the second report relating to Card.

5.41.    Second, Card's threat to shoot up the unit and commit a mass shooting necessitated an emergency Command-Directed Evaluation. OTSG MEDCOM Policy Memo 22-020 and DoD Instruction 6490.04 specify that a Commander or supervisor will refer a service member for an emergency Behavioral Health Evaluation as soon as feasible whenever: (1) the service member threatens violence; (2) the service member intends to cause injury; or (3) the commanding officer believes the service member is suffering a severe mental health disorder. Despite seeking a Command-Directed Evaluation in July, and these more dire threats in September, Reamer did not seek to have Card evaluated again.

5.42.    Additionally, as stated, Mote understood that to be probable cause to take Card into custody and remove his weapons under Maine's Yellow Flag law. However, neither he nor Reamer told law enforcement that Card's providers had ordered removing his firearms, or that the Army had already revoked his access to military weapons—information that would certainly have triggered Yellow Flag actions. Instead, they downplayed the seriousness of the situation to Sagadahoc County Deputy Skolfield, ultimately convincing him not to initiate the Yellow Flag process. As Skolfield later testified, had the Army not discouraged him, he was prepared to enter Card's home and invoke the Yellow Flag law to remove his firearms. The Army's failure to support—or even share critical facts—prevented a legal mechanism available to the local Maine community from being used to intervene before tragedy struck.

### D. *Inspector General Review of the Army's Conduct finds the Army failed to follow regulations and caused the mass shooting on October 25, 2023.*

5.43.    On September 9, 2025, the Department of Defense Inspector General released a report of an investigation (designated Report No. DODIG-2025-157) (referred to in this Complaint as the IG Investigation and IG Report). Plaintiffs attach Report No. DODIG-2025-157 as **Exhibit A** to this Complaint and incorporate it here.

5.44.    The IG investigation began in the aftermath of Card's mass shooting, with the goal of determining "the extent to which the DoD, Services, and National Guard have adequate policies and procedures in place to respond to reports of violent threats made by Service members."

5.45.    The IG Report concluded that the Department of Army had mandatory policies in place that required medical providers to report to law enforcement any Service member who make threats to kill or seriously injure others.[6] It noted that such conduct by a Service member would violate the Uniform Code of Military Justice and would be a criminal violation, subject to dishonorable discharge, and three (3) to ten (10) years in prison.

5.46.    Further, the IG Report concluded that Army commanders had mandatory obligations to report Card's threats to Army law enforcement. Card's supervisors had mandatory obligations to report Card's threats up their chain of command.[7]

5.47.    The Inspector General interviewed leadership for the various military branches and they uniformly stated that threats made by Service members against civilians and non-Governmental facilities and activities would **require** Commander Critical Information Reports ("CCIR").

---

[6] *See* Army Regulation 40-66 ("Medical Record Administration and Healthcare Documentation"); DoD Instruction (DoDI) 6490.04 ("Mental Health Evaluations of Members of the Military Services").

[7] *See* Army Regulation 600-20 ("Army Command Policy"); Army Regulation 195-2 ("Criminal Investigation Activities"); Army regulation 190-45 ("Law Enforcement Reporting"); Army Executive Order 222-17 ("Commander Critical Information Report Requirements").

5.48.    The IG Report revealed an investigation of violent threats by Service members occurring in 2023 and found that Army installation law enforcement failed to make mandatory reports to military criminal investigative organizations nearly 50% of the time.

5.49.    The DOD IG investigation included a review of the United States Army Reserve Command Report "Findings and Recommendations, Army Regulation (AR) 15-6 Investigation into the Suspected Suicide of SFC Robert R. Card II," from March 7, 2024. The DOD IG investigation stated that the "relevant findings of the investigation concluded that SFC Card's company commander:

- (U) failed to follow up with Sagadahoc County Sheriff's Office to ensure that SFC Card's family physically secured SFC Card's privately owned weapons;

- (U) created unnecessary doubt when reporting the threats made by SFC Card to the Sagadahoc County Sheriff's Office by informing the sheriff's deputy that the unit member who reported the threat 'should not be trusted;'

- (U) failed to cancel SFC Card's annual training orders following SFC Card's reporting mental health concerns to law enforcement and the unit;

- (U) failed to initiate a Commander's Critical Incident Report (CCIR) following SFC Card's family's report to law enforcement on May 3, 2023, on his mental health concerns;

- (U) failed to initiate a CCIR after SFC Card's release from the civilian behavior health hospital on August 3, 2023;

- (U) failed to initiate a CCIR for the incident on September 15, 2023, when a unit member reported that SFC Card threatened a mass shooting at the Butler U.S. Army reserve Center in Saco, Maine;

- (U) failed to inform the Department of the Army Criminal Investigation Division or the Army Insider Threat Hub on the threat reported by the unit member; and

- (U) failed to initiate or complete a Line of Duty determination regarding SFC Card's hospitalization and subsequent release in July 2023."

5.50.    In the IG Report's section titled "Impact of Not Properly reporting Violent Threats," the Inspector General concluded: "Failure to consistently report violent threats to [military law enforcement] could increase the risk of additional violent incidents by Service members, such as what occurred with SFC Card on October 25, 2023.

5.51.    In its response to the IG Report, the Army's designees agreed, noting that "improved documentation of notifications to [military criminal investigative organizations] is essential for effective investigation and tracking of violent threats." It continued: "The report's findings, couples with the U.S. Army reserve Command investigation into the SFC Card case, demonstrate the importance of consistent communications and collaboration between installation law enforcement and investigative agencies."

5.52.    The Army was given an opportunity to review the findings of the IG report. The Army concurred with the DoD Inspector General's findings and recommendations and did not dispute the findings in any way.

5.53.    In summary, the Army failed to follow the mandatory rules as outlined in this Complaint and the IG Report reveal that the failures increased the risk of harm to the public and, in the case of Card, the Army's acts and omissions caused the shooting on October 25, 2023.

## CAUSES OF ACTION

6.1.    All of the foregoing facts described in this Complaint are incorporated into the sections below as if fully stated here.

### A. Negligent Undertaking in the Investigation and Management of Robert Card's Mental Health Crisis.

6.2.    Under the Restatement (Second) of Torts § 324A, the United States did undertake to investigate, manage, and mitigate the acute medical and psychological dangers posed by Sgt. Robert Card to himself and others, including those he targeted at the bowling alley and bar in Lewiston, Maine on October 25, 2023. The failure to exercise reasonable care in that undertaking increased the risk of harm to Plaintiff and also caused physical and emotional injuries to be inflicted upon her.

6.3.    The undertaking on the part of the United States includes but is not limited to the following:

a.  Following reports of Card's declining mental status, erratic behaviors, threats of violence and access to weapons in March through July 2023, informing the Sagadahoc County Sherriff's Department and the Card family that it would ensure that Card received the necessary treatment and services to address Card's condition and minimize the dangers he posed to the community.

b.  Agreeing that it would coordinate with medical providers and other members of the Card family to address Card's worsening conditions.

c.  Promising that it would sit down and address the problems with Card at the next battle assembly.

d.  Ordering Card to attend the reserve unit's training in West Point, NY, despite prior knowledge of Card's deteriorating mental health.

e.  Issuing a command-directed behavioral health evaluation of Card during his time on active-duty training in New York and implementing that order through forcibly transporting Card to a hospital for medical evaluation and treatment.

f.  Undertaking to provide medical and psychiatric treatment of Card at Keller Army Hospital, as well as transferring Card to a civilian in-patient psychiatric hospital.

g.  Coordinating with the in-patient psychiatric hospital regarding Card's release, including agreeing that it would provide close monitoring, supervision and follow up for Card after his release from the hospital.

h.  Agreeing (and promising to the psychiatric hospital and Card's medical providers at Keller) that, as a condition of Card's release, it would ensure that Card no longer had access to firearms.

i.  Intervening to investigate and address renewed threats of violence and a specific threat to commit a mass shooting issued by Card in September 2023.

j.  Coordinating the response to Card's renewed threats, including through communications with local law enforcement.

6.4.   Having undertaken these responsibilities with respect to Card, the United States failed through individual and collective acts and omissions to reasonably fulfill such responsibilities. This negligence in carrying out these undertakings on the part of the United States includes but is not limited to the following specific acts and omissions:

a.  Failing to take reasonable actions to address Card's declining mental health and threatening behaviors of which the Army became aware between March and July 2023.

b.  Failing to refer Card for medical or psychological treatment between March and July 2023.

c.  Failing to fulfill promises to intervene and discuss the situation with Card at battle assembly between March and July 2023.

d. Failing to send Card for a medical and/or psychological evaluation before ordering him to attend cadet training at West Point in July 2023.

e. Failing to reasonably follow up on medical recommendations, orders, and Army directives issued following Card's inpatient hospitalization in July-August 2023.

f. Failing to ensure Card did not have access to firearms, reflecting the commitment made as a condition of Card's release from the hospital in August 2023.

g. Failing to reasonably respond after undertaking to manage Card's renewed threats of violence in September 2023.

h. Failing to clearly, reasonably, accurately, and completely relay key operative information to local law enforcement after undertaking to coordinate a response to Card's renewed threats of violence.

i. Failing to follow mandatory policies, procedures, and regulations related to Command-Directed Evaluations, Line of Duty Investigations and Medical Board Evaluation, Insider Threat and Serious Incident Reports.

j. Failing to follow mandatory policies, procedures, and regulations related to reporting information regarding Card within the chain of command.

k. Failing to follow mandatory policies, procedures, and regulations related to reporting Card's violent threats to Army's law enforcement.

6.5. As the IG report concluded, the failure of the United States to fulfill its undertaking increased the risk of harm and did result in harm to others, including physical and emotional injuries to Plaintiff Bobbi Nichols.

6.6. Not only did the United States permit Card to return to the community without following through on its commitment to remove Card's firearms and to ensure that Card's medical and

psychiatric conditions were addressed, but the decision of the United States to forcibly hospitalize Card exacerbated Card's paranoia, resentment, and anger, such that it actively increased the risks posed by Card following his discharge back into the community.

6.7.     As a resident of the Lewiston-Auburn community and frequent patron of Just-In-Time Recreation, Plaintiff is a member of the community where Card presented the greatest threat.

6.8.     Relying upon the United States' investigation and management of Card, Plaintiff forewent other opportunities to investigate, manage, and mitigate the dangers presented by Card.

6.9.     As a foreseeable consequence of the negligence of the United States in carrying out its undertaking to investigate, manage, and mitigate the known dangers posed by Card, Card remained in the community, untreated, unmedicated, without appropriate medical care and follow up, and in possession of numerous weapons and ammunition, including semi-automatic assault rifles and the Ruger semi-automative rifle he used to commit the mass shooting on October 25, 2023.

6.10.    The negligence of the United States in fulfilling the obligations and duties undertaken was a proximate cause of the mass shooting on October 25, 2023, which physically, emotionally, and psychologically harmed Plaintiff. Simply put, had the United States acted reasonably in its undertaking, Plaintiff would not have been injured in the worst mass shooting in Maine's history.

6.11.    On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.12.   Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.13.   Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

### B.  Negligence in Responding to Danger Within the Foreseeable Zone of Risk.

6.14.   The United States owed a legal duty to those within the foreseeable zone of risk created by the conduct of the United States relating to its handling of Card.

6.15.   The foreseeable zone of risk included those in the community where Card lived and to which he was discharged from the psychiatric hospital and those who were on Card's "hit list" and/or were the target and subject of his paranoia, delusions, and violent ideations, including those locations that Card expressly communicated to the Army that he was targeting, like those in the bar and bowling alley that Card frequented and who were injured or killed in the mass shooting.

6.16.   The negligence of the United States in fulfilling the duty owed to those within the foreseeable zone of risk includes but is not limited to the following specific acts and omissions:

Page 64 of 97

a. Failing to take reasonable actions to address Card's declining mental health and threatening behaviors of which the Army became aware as early as July 2022.

b. Failing to refer Card for medical or psychological treatment between March and July 2023.

c. Failing to intervene with Card at battle assembly between March and July 2023.

d. Failing to send Card for a medical and/or psychological evaluation before ordering him to attend cadet training at West Point in July 2023.

e. Failing to reasonably follow up on medical recommendations, orders, and Army directives issued following Card's in-patient hospitalization in July-August 2023.

f. Failing to ensure Card did not have access to firearms reflecting the commitment made as a condition of Card's release from the hospital in August 2023.

g. Failing to reasonably respond after undertaking to manage Card's renewed threats of violence in September 2023.

h. Failing to clearly, reasonably, accurately, and completely communicate key information to local law enforcement after undertaking to coordinate a response to Card's renewed threats of violence.

i. Failing to follow mandatory policies, procedures, and regulations related to Command-Directed Evaluations, Line of Duty Investigations, Medical Board Evaluation, Insider Threat and Serious Incident Reports.

j. Failing to follow mandatory policies, procedures, and regulations related to reporting information regarding Card within the chain of command.

k. Failing to follow mandatory policies, procedures, and regulations related to reporting Card's violent threats to Army's law enforcement.

6.17.   As a foreseeable consequence of the negligence of the United States in fulfilling the duty owed to those including Plaintiff, who lived within the foreseeable zone of danger, Card remained in the community, untreated, unmedicated, without appropriate medical care and follow up, and in possession of numerous weapons and ammunition, including many semi-automatic assault rifles and the Ruger semi-automatic assault rifle he used to commit the mass shooting on October 25, 2023.

6.18.   The negligence of the United States in fulfilling the duty owed to Plaintiff, who lived within the foreseeable zone of danger, was a direct and proximate cause of the mass shooting on October 25, 2023, which physically, emotionally, and psychologically injured Plaintiff.

6.19.   On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.20.   Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.21.    Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

### C.  Negligence of the United States in Violating Its Own Commitments, Orders, and Conditions of Card's Release Back into the Community

6.22.    Despite Card's ongoing paranoia, delusions and hallucinations, his homicidal ideations, and admission to having a "hit list," on August 3, 2023, the United States allowed Card to be discharged from the psychiatric hospital in New York back into the community in Maine.

6.23.    Card's release into the community under these circumstances was conditioned on commitments on the parts of both Card and the United States that each would take certain actions to reduce the danger posed by Card following his release.

6.24.    In particular, the United States assured Card's medical providers at both Four Winds Psychiatric Hospital and Keller Army Hospital that it would actively monitor and manage Card's mental health condition following discharge; that it would remain in regular communication with him to ensure compliance; that it would make sure he receive follow up medical treatment; that he remained on his prescribed medication; and that it would "ensure" that Card did not have ongoing access to firearms, either through the military or his own personal collection.

6.25.    Pursuant to Army policy, the responsibility of the Army to manage the mental health dangers posed by a service member does not end when the Army orders a Command-Directed

Evaluation. Rather, the regulations require the Army to ensure proper follow up after the evaluation is completed.

6.26.   MEDCOM Policy Memo 22-020 provides that "DA Form 3822 is the only authorized form to use by [military behavioral health providers] when documenting a report of behavioral or mental status."

6.27.   The DA Form completed following Card's referral for Command-Directed Evaluation detailed mandatory requirements on the part of both Card and his Army Reserve Unit, including that Card was  required to follow up with his medical care, remain in regular communication with the unit, take his prescribed medications, and that the Army would "ensure that measures be taken to safely remove all firearms and weapons from Card's HOR [home of record]."

6.28.   However, following his release from the psychiatric hospital, both Card and the Army violated Form 3822, failing to follow through–or outright ignoring–the directives contained therein:

   a.  Card did not maintain regular communication with his unit, and the unit did not maintain communication with him.

   b.  Card did not follow through with medical treatment, and the Army made little effort to ensure he did so.

   c.  Card stopped taking his medications, and the Army did nothing to ensure his compliance.

   d.  The Army did not fulfil its obligation to "ensure that measures be taken to safely remove all firearms and weapons."

6.29.   Not only did Card's own reserve unit and commanding officer take no meaningful action to comply with the directives of DA Form 3822, but there was a breakdown in the chain of

command, such that the issues pertaining to Card were not escalated through mandatory Serious Incident Reports, security clearance warnings, an Insider Threat response, suicide prevention requirements, and other basic requirements of Army Command Policy and similar applicable regulations to the higher-level, more professional Army personnel such as U.S. Army Reserve Command, with this experience, training, time, and resources to ensure lower level commands properly managed the situation and complied with Army policies. Battalion Commander Vazquez was aware of the events involving Card, but failed to take meaningful action to elevate the matter up the chain of command or otherwise assist the reserve unit to comply with its obligations regarding Card.

6.30.   The failure on the part of the Army to fulfill its obligations following Card's release from the psychiatric hospital resulted from incompetence, negligence, carelessness, and neglect, including, for example, Reamer stating that he did not follow up in part because he never saw the email from Nurse Pupo with instructions because he did not access his email until after the mass shooting of October 25.

6.31.   As a foreseeable consequence of the negligence of the United States in carrying out its undertaking to investigate, manage, and mitigate the known dangers posed by Card, Card remained in the community, untreated, unmedicated, without appropriate medical care and follow up, and in possession of numerous weapons and ammunition, including semi-automatic assault rifles and the Ruger semi-automative rifle he used to commit the mass shooting on October 25, 2023.

6.32.   The negligence of the United States in fulfilling the obligations and duties undertaken was a proximate cause of the mass shooting on October 25, 2023, which physically, emotionally, and psychologically harmed Plaintiff. Simply put, had the United States acted reasonably in its undertaking, Plaintiff would not have been injured in the worst mass shooting in Maine's history.

6.33.   On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.34.   Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.35.   Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

### D.  Negligent Care, Treatment, Discharge, Follow Up, and Failure to Warn.

6.36.   Upon the recognition that Card was suffering from an unexplained condition that made him a danger to himself or others, the United States assumed responsibility for Card's medical care and

treatment, including decisions regarding admission, discharge, and follow up to Card's hospital admission and the need to warn those in the community of the risks posed by Card.

6.37.   As such, the United States had a duty to provide Card with medical care, treatment, admission, discharge, follow up and warnings that were reasonable under the circumstances and consistent with accepted standards of medical and psychiatric care.

6.38.   The United States was negligent and breached its duty to provide medical care and treatment consistent with accepted standards for reasons that include but are not limited to the following:

   a.  The United States permitted Card to be discharged from care while he remained paranoid, delusional, and a risk to himself or others.

   b.  The United States failed to follow up on Card's specific homicidal ideations and his statement that he had a "hit list," thereby failing to ascertain the identities of those on his hit list and warn them of Card's homicidal intent.

   c.  The United States permitted Card to be discharged without understanding the root cause of Card's sudden and precipitous change in behavior and, therefore, having no reasonable plan for treatment to mitigate the risks that Card posed to himself or others.

   d.  Despite its awareness that Card had a long history as a grenade and firearms trainer, and the Army's knowledge that such exposure may cause brain injuries that lead a service member to become a risk to himself or others, the United States performed no testing or evaluation to determine whether there was a psychological etiology of Card's severe and precipitous change in behavior. His is particularly so, because late onset schizophrenia symptoms of the type Card was displaying are rare and more likely to be cause by brain injury etiology than abrupt and unexplained new onset of schizophrenia.

e.  The United States allowed Card to be discharged without a careful review of his medical records, treatment history, or test results, review of which would have revealed that Card had been recalcitrant to treatment, remained paranoid and delusional, and was merely going through the motions to "game the system" so that he could obtain a discharge back into the community.

f.  Following discharge from the hospital, and even in the presence of renewed threats, the United States failed to provide reasonable follow up or additional medical evaluation and treatment.

g.  Following discharge from the hospital, and even in the presence of renewed threats, the Army failed to follow mandatory policies, procedures, and regulations related to reporting Card's violent threats to Army's law enforcement and up the chain of command.

6.39.   As the IG Report concluded, the failure to follow these mandatory regulations resulted in an increased risk of additional violent incidents, such as what occurred with Card. Thus, the Government's failures increased the risk of harm, which resulted in physical and emotional injuries to Plaintiff on October 25, 2023.

6.40.   As a foreseeable consequence of the negligence of the United States in its medical care, treatment, admission, discharge, follow up, and warnings Card was released back into the community and remained in the community untreated, unmedicated, without appropriate medical care and follow up, and in possession of numerous weapons and ammunition, including many semi-automatic assault rifles and the Ruger he used to commit the mass shooting on October 25, 2023.

6.41.    The negligence of the United States in fulfilling the obligations and duties undertaken was a proximate cause of the mass shooting on October 25, 2023, which physically, emotionally, and psychologically harmed Plaintiff. Simply put, had the United States acted reasonably in its undertaking, Plaintiff would not have been injured in the worst mass shooting in Maine's history.

6.42.    On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.43.    Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.44.    Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

**E. Negligence and Negligent Undertaking of United States in Failing to Follow Process for Line of Duty Investigation and Medical Board Adjudication of Robert Card's Illness.**

6.45. As the Army's investigation concluded, the United States violated a mandatory obligation to adjudicate Card's mental condition through initiation of a Line of Duty Investigation and review by the Medical Evaluation Board.

6.46. Had the United States adhered to its required process, Card would have been retained on active duty pending the outcome and eventually adjudicated by the Medical Evaluation Board to have a mental health condition that presented a danger to himself or others.

6.47. DA Form 3822 provided that Card "does NOT meet medical retention standards, has reached medical retention determination point, and a Disability Evaluation System referral is indicated."

6.48. The Army and DoD are required to conduct a Line of Duty Investigation and review by the Medical Evaluation Board under these circumstances. In fact, Card's Form 3822 initiates that process. However, the United States failed to adhere to these mandatory procedures or to exercise reasonable care in this undertaking. The Army violated its own policies, and the specific directive contained within DA Form 3822, and did not conduct a Line of Duty investigation or initiate the Disability Evaluation System. The United States' failure to exercise reasonable care increased the risk of harm to Plaintiff.

6.49. Rather than maintaining Card on orders pending these required actions, the Army released Card from his orders and allowed him to return to the community without addressing the risks Card continued to pose to himself and others, and without fulfilling its promise to separate Card from his personal firearms.

6.50.   Pursuant to Army Regulation 600-8-4, in making this "line of duty" determination, "mental soundness can only be determined by a behavioral health expert."

6.51.   Depending upon the circumstances, a "line of duty" investigation may be "informal" or "formal." The distinction turns on the nature of the seriousness of the service member's injury or illness (as defined by regulation), with more serious matters requiring a "formal" investigation.

6.52.   Under the circumstances here, the regulations required a formal investigation:

a. An LOD investigation will be conducted for all Soldiers, regardless of Component, if the Soldier experiences a loss of duty time for a period of more than 24 hours and –

(1) The injury, illness, or disease is of lasting significance (to be determined by a physician, physician assistant, or nurse practitioner) (see para 5-4b for other guidance)

(2) There is a likelihood that the injury, illness, or disease will result in a permanent disability.

(4) if an RC Soldier requires follow-up care for an injury, illness, or disease incurred during a period of active duty.

AR-800-8-4 at 6.

6.53.   A "formal" line of duty investigation begins with the appointment of an investigating office by the appointing authority (defined in section 1-15 of AR-800-8-4). Formal investigations "must be initiated within 5 calendar days of the command's discovery of the . . . illness, disease." The investigating office in a formal investigation must collect all evidence including police reports, medical records, sworn witness statements, etc. Had the Army followed proper command

procedures, it would have first learned of Card's "injury" in March and affirmatively on notice of it by May 2023.

6.54.   In addition to Line of Duty Investigations, DoD Instruction 1332.18 outlines the requirements of the Army's Disability Evaluation System. The policy is "the mechanism for determining fitness for duty because of a disability, and whether a Service member . . . found unfit for duty due to disability will be separated or retired." The policy provides that disability evaluations will be "consistently applied" to all service members, including reserves and service members on active-duty and non-active-duty status.

6.55.   The Medical Evaluation Board is responsible for reviewing "all available medical evidence, including examinations completed as part of [Disability Evaluation System] processing, and document whether the Service member has medical conditions that either singularly, collectively, or through combined effect, may prevent them from reasonably performing the duties of their office, grade, rank, or rating."

6.56.   The Medical Board is required to prepare a narrative summary of its evaluation and findings. The summary must include a list of diagnoses, and for each condition that does not meet medical retention standards, categories of information, including: the medical basis of the diagnosis; prognosis; and where the Soldier has behavioral health diagnoses, a statement of whether the Soldier is dangerous to themselves or others.

6.57.   The Medical Board contains due process rights for the Soldier, allowing the Soldier to access representation, testify, present rebuttal evidence, and appeal an adverse action.

6.58.   The Army was required to begin the investigation within five days of discovering Card's mental illness.

6.59.    Here, had the Army followed mandatory requirements to initiate a Line of Duty Investigation, such investigation would likely have been initiated–and completed–while Card remained under active-duty orders and hospitalized.

6.60.    Given Card's medical records, combined with evidence of lack of compliance and ongoing severe paranoia, delusions, and violent ideations, any reasonable Board process would have yielded a determination that Card continued to present a danger to himself and others–particularly in the wake of Card's non-compliance following release from Four Winds and his renewed threats in September.

6.61.    Card's adjudication by the Medical Board that he remained a danger to himself and or others would have made it illegal for Card to continue possessing firearms.

6.62.    The Gun Control Act, 18 U.S.C. § 922(d)(4), provides that "[i]t shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person . . . has been adjudicated as a mental defective."

6.63.    Section (g)(4) provides that it is unlawful for "any person adjudicated as a mental defective . . . to process in or affecting commerce, any firearm or ammunition, or to receive any firearm or ammunition which has been shipped or transported in interstate commerce."

6.64.    The implementing regulation, promulgated by the Bureau of Alcohol, Tobacco, and Firearms (ATF), 27 C.FR.R. § 478.11 defines "Adjudicated as a mental defective" to mean

   (a) A determination by a court, **board** commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:

   (1) Is a danger to himself or to others; or

   (2) Lacks the mental capacity to contract or manage his own affairs.

6.65.   Accordingly, following any reasonable adjudication of Card's mental status by the Medical Board, the United States would have been required to report Card to the FBI's National Instant Criminal Background Check System (NICS). Such reporting would have caused Card to be flagged as a "prohibited person," thereby making it unlawful for Card to remain in possession of firearms.

6.66.   The United States Congress voluntarily undertook the creation of a national instant background check system upon passage of the Brady Bill. To implement this system, the Department of Justice created the National Instant Criminal Background Check System.

6.67.   In undertaking to create and manage a national background check system, the Government assumed a duty under the common law to operate the NICS with reasonable care.

6.68.   Because the United States violated its own regulations regarding immediate referral to the Medical Board, this adjudication did not occur and, therefore, Card remained in possession of his firearms. As the IG Report concluded, the failure to follow these mandatory regulations resulted in an increased risk of additional violent incidents, such as what occurred with Card. In sum, the Government's failures increased the risk of harm to the public, and ultimately, resulted in physical and emotional injuries to Plaintiff Bobbi Nichols.

6.69.   The failure of the United States to follow its own policies with respect to completing a Line of Duty Investigation and Medical Evaluation Board was a substantial contributing factor in the events that allowed Card to remain in the community, untreated, unmedicated, without appropriate medical care and follow up, and in possession of numerous weapons and ammunition, even after Card renewed his threats of violence, including threats of a mass shooting, in September 2023.

6.70.   The negligence of the United States in fulfilling the obligations and duties undertaken was a proximate cause of the mass shooting on October 25, 2023, which physically, emotionally, and

psychologically harmed Plaintiff. Simply put, had the United States acted reasonably in its undertaking, Plaintiff would not have been injured in the worst mass shooting in Maine's history.

6.71.    On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.72.    Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.73.    Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

**F. Negligence and Negligent Undertaking in Failure to Report Card to the FBI Background Search Database Based on His Commitment to a Mental Institution.**

6.74. The Gun Control Act, 18 U.S.C. § 922(d)(4), provides that "[i]t shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person . . . has been committed to any mental institution." Section (g)(4) provides that it is unlawful for "any person . . . who has been committed to a mental institution . . . to possess in or affecting commerce, any firearm or ammunition, or to receive any firearm or ammunition which has been shipped or transported in interstate commerce."

6.75. The United States Congress voluntarily undertook the creation of a national instant background check system upon passage of the Brady Bill. To implement this system, the Department of Justice created the National Instant Criminal Background Check System.

6.76. In undertaking to create a national background check system, the United States assumed a duty under the common law to operate the NICS with reasonable care. The United States' failure to exercise reasonable care in its undertaking increased the risk of harm to the people of Lewiston-Auburn Maine and resulted in physical and emotional injuries to Plaintiff Bobbi Nichols.

6.77. Card was committed to a mental institution within the meaning of the Gun Control Act and, therefore, should have been reported as a person prohibited from purchasing or possessing firearms.

6.78. Army personnel compelled Card under duress and threat of sanction to go to the hospital and to be admitted as an inpatient at a mental health institution. Card was under direct orders to be committed, and Card was obligated to follow that order. If Card disobeyed the order, then he would have been subject to court-martial proceedings.

6.79.    Army personnel forced Card into the third row of a vehicle with two reserve Soldiers in the second row to prevent his escape. The Army asked the New York State Police to escort their vehicle to the hospital.

6.80.    Upon arrival at Keller Army Hospital, the Army place Card under continual surveillance with one-on-one supervision provided by members of his reserve unit. After evaluation, the Army made the unilateral determination that Card's psychiatric condition was more severe than it could manage at Keller and made the decision to transfer him to a civilian psychiatric hospital for inpatient psychiatric care.

6.81.    Card's medical evaluation and treatment, including his commitment to the psychiatric hospital, were compelled by an Army order. Failure on the part of Card to comply would have subjected Card to severe penalties, including court-martial and sanctions.

6.82.    After his admission and while he remained hospitalized, Card continued to refuse to accept the legitimacy of his compulsory confinement, making numerous statements to providers that he was wrongly committed and refusing to accept or participate in treatment.

6.83.    If Card were free to leave in-patient care, he would not need to petition for a 72-hour release.

6.84.    Given the conditions of duress under which Card was admitted to the psychiatric hospital, the fact that he was compelled to be there by an Army order, his confinement there is a "commitment" within the meaning of the Gun Control Act—a law whose purpose is to prevent those with illness severe enough to require compulsory in-patient psychiatric care from having continuing access to firearms.

6.85.    After his discharge from Four Winds, Card attempted to purchase a silencer at Coastal Defense Firearms, located at 179 High Street, Auburn, Maine. Before completing the purchase,

Card was required to complete an ATF Form 4473. One of the questions on the form asks: "Have you ever been adjudicated as a mental defective OR have you ever been committed to a mental institution?" The instructions for this question define "committed to a mental institution" consistent with the Federal regulation 27 C.F.R. § 478.11. Card answered this question, "Yes," indicating his understanding that he had been "committed" to a mental institution within the meaning of the Code of Federal Regulations, and therefore the store denied the sale.

6.86.    Likewise, based upon the United States' understanding of the compulsory nature of Card's confinement in the psychiatric hospital with findings of homicidal ideation and admission to having a "hit list," the United States knew or should have known that Card's confinement was compulsory and achieved under duress and threat, initiated by the Army's own command-directed order, and that those circumstances made it likely that Card would be considered "committed" within the meaning of the Gun Control Act, requiring that Card be reported to the FBI for inclusion in the NICS databank as a person who, by law, could no longer legally purchase or possess firearms.

6.87.    Had the Army fulfilled its duties under the Gun Control Act, the Army's decision to forcibly commit Card to a psychiatric hospital would have resulted in actions including but not limited to: (a) mandatory reporting of Card to the FBI's National Instant Criminal Background Check System (NICS); (b) communication of Card's "prohibited person" status to the Federal and local law enforcement; (c) prohibitions against the purchase of firearms and ammunition at the point of sale; and (d) mandate for search of Card's residence and seizure of his firearms.

6.88.    Accordingly, the failure of the United States to follow the law pertaining to the commitment of a person in a psychiatric hospital was a substantial contributing factor that allowed Card to remain in the community, untreated, unmedicated, without appropriate medical care and follow up

and in possession of numerous weapons and ammunition, even after Card renewed his threats of violence, including threats of a mass shooting, in September 2023.

6.89.    The negligence of the United States in failing to follow the requirements of the Gun Control Act was a direct and proximate cause of the mass shooting on October 25, 2023, which physically, emotionally, and psychologically injured Plaintiff. Had the United States acted reasonably and followed the requirements of the Gun Control Act, Card would not have possessed a gun nor committed the mass shooting. Because of the wrongful and actionable conduct of the United States, Card was able to, and ultimately did, inflict physical and emotional injuries on Plaintiff Bobbi Nichols.

6.90.    On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.91.    Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.92.   Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

6.93.

### G.  Negligence in Failure to File SAFE Act Report

6.94.   In response to the 2014 mass shooting at Sandy Hook Elementary School in Newtown, Connecticut, New York passed the Secure Ammunition and Firearms Enforcement Act (SAFE Act). *See* NY Mental Hygiene Law § 9.46.

6.95.   NY's SAFE Act provides:

> When a mental health professional currently providing treatment services to a person determines, in the exercise of reasonable professional judgement, that such person is likely to engage in conduct that would result in serious harm to self or others, he or she shall be required to report, as soon as practicable, to the director of community services, or the director's designee, who shall report to the division of criminal justice services whenever he or she agrees that the person is likely to engage in such conduct.

6.96.   Card met the standard for mandatory SAFE Act reporting for reasons including but not limited to the following:

   a.   Keller Army Hospital placed Card in one-on-one supervision throughout his stay.

   b.   Card continued to express paranoid delusions while at Keller.

   c.   Card told his providers, "I am afraid of what I may do if people still keep bothering me about the so-called voices that I am hearing being homosexual and a pedophile."

   d.   Card stated, "he would take action if people keep talking about him."

e.  Card endorsed homicidal ideation, meaning that he presented a danger to himself or others and may require restraints during transport.

f.  Card's providers explicitly determined that Card was not safe to continue accessing military weapons and his personal firearms should be removed.

g.  Card's Keller providers represented to Four Winds that it had completed SAFE Act reporting and only later admitted that it had not done so because of an erroneous interpretation of reporting requirements.

6.97.   The United States negligently breached its mandatory duty to make a SAFE Act report relating to Card.

6.98.   The negligence of the United States in failing to file a mandatory SAFE Act report resulted from the unreasonable acts and omissions of individual providers, as well as lack of policies, training, and supervision by the United States in developing and training providers on the proper standards and procedures for SAFE Act reporting under New York law and regulations

6.99.   Additionally, after transferring Card to Four Winds, the United States negligently represented to Four Winds that it had *already filed* a SAFE Act report, despite having not done so.

6.100.  As a foreseeable consequence of the Army's negligence in misreporting to Four Winds its filing of a SAFE Act report, Four Winds determined that a report had already been filed on Card and, therefore, it did not need to do so. It was foreseeable to the Army that Four Winds would not file a SAFE Act report if the Army led them to believe that one had been filed already.

6.101.  Had the United States fulfilled its obligation to file a SAFE Act report, it is likely that this would have led to one or more of the following: (a) reporting of Card to the FBI's National Instant Criminal Background Check System (NICS); (b) communication of Card's "prohibited person" status to the Federal and local law enforcement; (c) prohibitions against the purchase of firearms

and ammunition at the point of sale; and (d) mandate for search of Card's residence and seizure of his firearms.

6.102. Accordingly, the failure of the United States to report Card under the SAFE Act was a substantial contributing factor in the events that allowed Card to remain in the community, untreated, unmedicated, without appropriate medical care and follow up, and in possession of numerous weapons and ammunition, even after Card renewed his threats of violence, including threats of a mass shooting, in September 2023.

6.103. The negligence of the United States in failing to report Card under the SAFE Act was the direct and proximate cause of the mass shooting on October 25, 2023, and the direct and proximate cause of physical, emotional, and psychological injuries to Plaintiff. Had the United States acted reasonably and reported Card under the SAFE Act, Card would not have possessed a gun to commit the mass shooting. By virtue of the United States' wrongful and actionable conduct, Card was enabled to, and ultimately did, inflict physical and emotional injuries harm on Plaintiff Bobbi Nichols.

6.104. On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.105. Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to

sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.106. Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

### H. Negligent Training

6.107. The United States was negligent in. training its personnel in managing a service member with physical and/or mental health issues, who had expressed violent ideations and threats to commit a mass shooting. The United States was negligent in training its personnel in identifying and managing service members with signs and symptoms of brain injuries from exposure to blast forces. The United States was also negligent in training its personnel on the operational requirements of reporting to the FBI NICS system when a service member, like Card, has been involuntarily committed to a mental institution.

6.108. During the nearly eight years that Card was in B Company, he and his peers, not to mention his chain of command, would have been required to complete mandatory training on insider threats and suicide prevention. If they did receive this training, it was deficient.

6.109. Accordingly, the failure of the United States to properly train its personnel was a substantial contributing factor in these events that allowed Card to remain in the community , untreated,

unmedicated, without appropriate medical care or follow up and in possession of numerous weapons and ammunition, even after Card renewed his threat of violence, including threats of a mass shooting in September.

6.110.  The negligence of the United States in failing to report Card under the SAFE Act was the direct and proximate cause of the mass shooting on October 25, 2023, and the direct and proximate cause of physical, emotional, and psychological injuries to Plaintiff. Had the United States acted reasonably and reported Card under the SAFE Act, Card would not have possessed a gun to commit the mass shooting. By virtue of the United States' wrongful and actionable conduct, Card was enabled to, and ultimately did, inflict physical and emotional injuries harm on Plaintiff Bobbi Nichols.

6.111.  On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.112.  Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.113. Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

### I.   Negligent Supervision

6.114. Reamer, Mote, Tlumac, Dickinson, Vazquez, and other members of the unit, chain of command, or Keller Army Hospital, and Keller Army Hospital's chain of command violated Army policies and procedures and were negligent in their management of the risks posed by Card.

6.115. The United States had a duty to reasonably supervise these employees to ensure Army policies, procedures, and federal law—including but not limited to the Gun Control Act, Command-Directed Evaluations, Serious Incident Reports, Line of Duty Investigations, SAFE Act Reporting—were being followed and implemented.

6.116. The negligence of these employees resulted from the United States' breach of its duty to supervise these employees.

6.117. Accordingly, the failure of the United States to properly supervise its personnel was a substantial contributing factor in these events that allowed Card to remain in the community, untreated, unmedicated, without appropriate medical care and follow up and in possession of numerous weapons and ammunition, even after Card renewed his threat of violence, including threats of a mass shooting in September.

6.118. The negligence of the United States in failing to report Card under the SAFE Act was the direct and proximate cause of the mass shooting on October 25, 2023, and the direct and proximate

cause of physical, emotional, and psychological injuries to Plaintiff. Had the United States acted reasonably and reported Card under the SAFE Act, Card would not have possessed a gun to commit the mass shooting. By virtue of the United States' wrongful and actionable conduct, Card was enabled to, and ultimately did, inflict physical and emotional injuries harm on Plaintiff Bobbi Nichols.

6.119.  On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.120.  Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.121. Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress

damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

### J.   Negligent Infliction of Emotional Distress (Bystander Liability)

6.122. On October 25, 2023, Plaintiff was physically present inside the bowling alley Just-In-Time Recreation together with her sister, Tricia Asselin. Plaintiff was directly physically and emotionally injured and, in addition, she watched as Card shot and killed her sister.

6.123.  Plaintiff suffered physical injuries and severe and lasting emotional injuries as a direct and proximate cause of watching Card shoot and kill her sister while being trampled upon, injured, having another person behind her shot, fall on top of and bleed out on her body.

6.124. The United States owed a duty to Plaintiff to prevent the mass shooting and prevent Plaintiff from physical and severe emotional injuries.

6.125.  The United States breached the duty of care that it owed to Plaintiff to prevent Plaintiff from suffering physical and severe emotional injuries, including watching Card shoot and kill her sister.

6.126.  As a direct and proximate cause of the United States' negligence, Plaintiff suffered physical and severe emotional injuries on the night of October 25, 2023.

6.127.  Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.128.  Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.129.  Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

### K.  Negligent Infliction of Emotional Distress (Zone of Danger Liability)

6.130.  Plaintiff was at the bowling alley on October 25, 2023, and was directly in danger of immediate and serious bodily harm, including death.

6.131.  The United States' negligence placed the Plaintiff in a zone of danger where she was exposed to immediate and serious bodily harm, including death.

6.132.  As a result of being placed in danger of immediate bodily harm, the Plaintiff experienced severe emotional distress and/or physical injuries caused by severe emotional distress.

6.133.  On the night of October 25, 2023, Plaintiff suffered direct physical and emotional injuries. Since the night of October 25, 2023, Plaintiff has suffered inexplicable physical, emotional, and psychological trauma and pain. On the night of the shooting, Plaintiff was trampled after dropping to the floor to avoid being shot. While on the floor, she was injured. Plaintiff next saw Card

mercilessly shoot and kill her sister, Tricia Asselin. As Plaintiff laid in shock, one of Card's shooting victims collapsed on top of Plaintiff and bled out on her body. Although Plaintiff managed to flee the building, the horrors she suffered and endured left her battered and traumatized.

6.134.  Since the shooting, Plaintiff suffers greatly. Often unable to bring herself out of bed, she lives in constant paralysis constrained by fear and anxiety. Plaintiff is now generally unable to sleep, feel safe, leave her home, work, maintain relationships, engage her community, feel motivation or joy, and live a normal life. Even after engaging with multiple licensed psychologists, Plaintiff is also frequently consumed with and overwhelmed by grief, depression, and anxiety, which leave her weak and prevents her ability to function normally.

6.135.  Plaintiff seeks all remedies recognized by law, including monetary damages for injury, conscious pain and suffering, loss of care, comfort, society and companionship of those killed, including her sister, pain and suffering, loss of enjoyment of life, emotional distress, past and future economic loss, past and future medical expenses, permanency, bystander emotional distress damages, attorneys fees, costs, and such other and further relief as this Court deems just and equitable.

6.136.

## DAMAGES

7.1.    As a direct and proximate cause of the United States' negligence described above, Plaintiff was damaged.

### A. Plaintiff's Physical Injuries

7.2.    During the shootings on October 25, 2023, Plaintiff suffered physical injuries and was damaged. The elements of Plaintiff's damage includes, but is not limited to:

    a.  Past and future medical expenses;

    b.   Future life care expenses;

    c.   Past and future lost earnings and earning capacity;

    d.   Past and future pain, suffering, loss of enjoyment of life, emotional distress, and mental anguish;

    e.   Permanency and permanent impairment; and

    f.   All other damages entitled to her under the law.

**B. Plaintiff's Bystander Claim: Present with a Family Member and Suffered Severe Emotional Distress and/or Physical Injuries Caused by Her Severe Emotional Distress**

7.3.    Present at the bowling alley on October 25, 2023, with her sister Tricia Asselin, Plaintiff suffered severe emotional distress and/or physical injuries caused by severe emotional distress.

7.4.    Plaintiff was damaged by her emotional distress. The elements of her damages include, but are not limited to:

    a.   Past and future medical expenses;

    b.   Future life care expenses;

    c.   Past and future lost earnings and earning capacity;

    d.   Past and future pain and suffering, loss of enjoyment of life, emotional distress, and mental anguish;

    e.   Permanency and permanent impairment; and

    f.   All other damages entitled to her under the law.

**C. Plaintiff's Zone of Danger Claim**

7.5.    Plaintiff was present at the bowling alley and suffered severe emotional and/or physical injuries caused by her severe emotional distress from being in a zone of danger where she was exposed to immediate and serious bodily injury.

7.6.    Plaintiff was damages by the severe emotional distress she suffered because of her exposure to immediate and serious bodily injury at the bowling alley on October 25, 2023. The elements of her damages include but are not limited to:

    a.  Past and future medical expenses;

    b.  Future life care expenses;

    c.  Past and future lost earnings and earning capacity;

    d.  Past and future pain and suffering, loss of enjoyment of life, emotional distress, and mental anguish;

    e.  Permanency and permanent impairment; and

    f.  All other damages entitled to her under the law.

## JURISDICTION & VENUE

8.1.    This action is brought under the provisions of the Federal Tort Claims Act, Title 28 U.S.C. §§ 1346(b), 2672 and 2675(a).

8.2.    The substantive law of the State of Maine applies to this lawsuit. 28 U.S.C. § 1346(b)(1).

8.3.    Venue is proper in this district under 28 U.S.C. § 1402(b) because the United States is a Defendant and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Further, venue is proper because at least one Plaintiff resides in this judicial district.

8.4.    Plaintiff's claims were delivered to the United States Army alleging a sum certain.

8.5.    Plaintiff set forth a brief description of the facts giving rise to this lawsuit.

8.6.    This lawsuit was filed more than six months after presentation of Plaintiff's claims.

8.7. Since the presentation of Plaintiff's claims to the appropriate agency, the United States has failed to take final action on Plaintiff's claims within six months of presentation. Therefore, Plaintiff has sufficiently exhausted the administrative process, and her claims are deemed denied.

8.8. Plaintiff has complied with all jurisdictional prerequisites and conditions precedent to filing suit against the United States of America.

**SERVICE**

9.1. The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the United States Attorney for the District of Maine by certified mail, return receipt requested at his office: Andrew B. Benson, U.S. Attorney for the District of Maine, ATTN: Civil Process Clerk, 100 Middle St., 6th Floor East, Portland, ME 04101.

9.2. The United States also needs service of the Summons and Complaint on Pamela Bondi, Attorney General of the United States, by certified mail, return receipt requested at: The Attorney General's Office, ATTN: Civil Process Clerk, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

**CONCLUSION**

Plaintiff requests that Defendant be cited to appear and answer herein: that upon final bench trial, Plaintiff have a judgment against the Defendant for the amount of actual damages; and for such other and different amounts as they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other and further relief, at law and in equity, both general and special, to which the Plaintiff may show herself entitled to and to which the Court believes her deserving.

DATED at Portland, Maine, this 6th day of April 2026.

Respectfully Submitted,
Bobbi Nichols
By Counsel,

*/s/ Jeffrey Bennett, Esq.*

_____

Jeffrey Bennett, Esq. #7223
Brooke Bailey, Esq. #6760
Allison McGonagle, Esq. #10763
Legal-Ease, LLC, P.A.
Two City Center, 4th Floor
Portland, ME 04101
P: 207-805-0055